## Case No. 4,499.

The ENTERPRISE.

[1 Paine, 32;[1] 4 Hall, Law J. 115.]

Circuit Court, D. New York. Sept. Term, 1810.

---

[1] [Reported by Elijah Paine, Jr., Esq.]

G. Griffen, for appellant.
N. Sanford, Dist. Atty., for respondent.

LIVINGSTON, Circuit Justice. Although the libel in this case contains a variety of articles, it is agreed that if any violation of law have been committed, it consists in lading of certain merchandise, of the value of more than four hundred dollars, on board of the schooner Enterprise in the night, without a license or permit from the collector and naval officer, and without the inspection of any officer of the revenue. This allegation being fully proved, it only remains to decide whether this act worked a forfeiture of vessel and cargo. The law, which is supposed to attach these consequences to conduct of this kind, is the supplementary embargo act which passed the 25th of April, 1808. Of this law, reliance is placed on the second section, which declares—"That during the continuance of the act laying an embargo, no ship or vessel of the character of the Enterprise shall receive a clearance, unless the lading shall be made under the inspection of the proper revenue officers, subject to the same restrictions, regulations, penalties, and forfeitures, as are provided by law for the inspection of merchandise imported into the United States, upon which duties are imposed, any law to the contrary notwithstanding." This section, it is conceived, implicates a vessel loaded in this manner, and its cargo, in the same penalties which are imposed by the 50th section of the collection law on the landing of goods imported contrary to its directions; which are, "that no goods brought from a foreign port shall be unladen but in open day, between the rising and setting of the sun, except by special license from the collector and naval officer of the port, nor at any time without their permit." The

penalties for an infraction of either of these directions are, a forfeiture by the master, and every other person knowingly concerned, or aiding therein, of the sum of four hundred dollars; a disability from holding any office of trust or profit under the United States, for a term not exceeding seven years, with an advertisement of their names by the collector in one of the public newspapers. The goods so landed are also declared to be forfeited, in which fate the vessel is likewise involved, if their value at the port where landed, shall amount to four hundred dollars.

On the argument much aid was attempted to be derived by each party from the rules which have been applied to the construction of penal statutes, and although the counsel differed greatly in their understanding of these rules, the common law has not left us in the dark on this subject. The act, and particularly that part of it under which a forfeiture is claimed, is highly penal, and must therefore be construed as such laws always have been and ever should be. But while it is said that penal statutes are to receive a strict construction, nothing more is meant than that they shall not, by what may be thought their spirit or equity, be extended to offences other than those which are specially and clearly described and provided for. A court is not. therefore, as the appellant supposes, precluded from inquiring into the intention of the legislature. However clearly a law be expressed, this must ever, more or less. be a matter of inquiry. A court is not however permitted to arrive at this intention by mere conjecture, but it is to collect it from the object which the legislature had in view and the expressions used, which should be competent and proper to apprize the community at large of the rule which it is intended to prescribe for their government. For although ignorance of the existence of a law be no excuse for its violation, yet if this ignorance be the consequence of an ambiguous or obscure phraseology, some indulgence is due to it. It should be a principle of every criminal code, and certainly belongs to ours, that no person be adjudged guilty of an offence unless it be created and promulgated in terms which leave no reasonable doubt of their meaning. If it be the duty of a jury to acquit where such doubts exist concerning a fact. it is equally incumbent on a judge not to apply the law to a case where he labours under the same uncertainty as to the meaning of the legislature. If this be involved in considerable difficulty from the use of language not perfectly intelligible, unusual circumspection becomes necessary—especially if the consequences be so penal as scarcely to admit of aggravation. When the sense of a penal statute is obvious, consequences are to be disregarded; but if doubtful, they are to have their weight in its interpretation. It will at once be conceded that no man should be

stripped of a very valuable property, perhaps of his all,—be disfranchised, and consigned to public ignominy and reproach, unless it be very clear that such high penalties have been annexed by law to the act which he has committed. If these principles be correct, as they are deemed to be, a court has no option where any considerable ambiguity arises on a penal statute, but is bound to decide in favour of the party accused. "It is more consonant to the principle of liberty," says an eminent English judge, "that a court should acquit when the legislature intended to punish, than that it should punish, when it was intended to discharge with impunity." Some of these principles have been overlooked altogether, or but little attended to in the argument of the cause. They are, therefore, now brought into view, and will govern the court in deciding on the present appeal.

The attention of the court has been called to a history of the progress of the several laws relating to the embargo, and to the mischiefs which were unprovided for, at the time of the passage of the one under consideration, in order to show what was intended by the legislature. Almost every possible evasion, it is said, had been previously guarded against by adequate sanctions, except that of loading clandestinely or by night, and then watching an opportunity of going to sea without a clearance, or giving bonds—which was the evil to which it was intended to apply a remedy. Be it so. This may have been in the contemplation of congress, but we are not bound to conclude that they have done what was intended, unless fit words be used for the purpose.

In examining the act, the first difficulty which occurs, is that no words of prohibition are to be found in this section. There is no interdiction to load at any time, nor without the intervention of the revenue officers. Penal laws generally first prescribe what shall or shall not be done, and then declare the forfeiture. This course is pursued in all the other offences created by this statute, and very generally by all the other penal laws of the United States. The court will not say that an offence can be created in no other way, but when we perceive such a departure from one almost universal, and from other parts of the same law, it suggests strong doubts whether the legislature intended to prevent in any other way than by the withholding of a clearance what it is supposed they had so much at heart. The word "subject," it is presumed, supplies this deficiency, and is sufficient to inflict a penalty. This may be the case when it follows a prohibition not to do a particular act. If it had been declared that no vessel should be loaded but in a certain way, subject to certain consequences, such form of expression might be liable to no objection. But the embarrassment is, what meaning to assign to this word, as it is here used. Is the inspection to be made subject to certain regulations, penalties, and forfeitures, to entitle the vessel to a clearance? Or are vessel and cargo rendered liable to confiscation if these ceremonies be omitted? But of what use then, it is asked, are the terms "penalties" and "forfeitures?" Or are they to be rejected as surplusage? If no sense can be discovered for them, as they are here introduced, the court had better pass them by as unintelligible and useless, than to put on them, at great uncertainty, a very harsh signification, and one which the legislature may never have designed. The court is not without its doubts whether it was meant to punish the mere act of loading secretly, in any other way than by the denial of a clearance—and to this consequence these words may have been intended to have reference. This doubt which is produced by the unusual and not very luminous phraseology of this section, is greatly increased by a consideration of the very heavy and disproportionate punishment which will follow, if the construction of the respondents be correct. This section, whatever was intended by it, seems to contain nothing more than a direction to the custom-house officers not to grant clearances in particular cases; which understanding of it derives some support from the expression of "any law to the contrary notwithstanding;" which not only closes the whole sentence, but most obviously refers, and exclusively, to prior laws respecting clearances, and which permitted the granting of them to vessels, although laden in the night and in the absence of a revenue officer. It is more reasonable to believe that the refusal of a clearance was to be the only consequence of loading in this way, than to suppose the legislature so inconsiderate as to punish a bare intention to violate these laws, if a mere loading in this way be evidence of such intention and which might be abandoned, with so much more severity than an actual and open infraction of them by sailing with a valuable vessel and cargo to a foreign port. The court is not disposed to impute to any public body so great an inconsistency, unless manifested in a way to leave no doubt of its being chargeable on them.

But if it were designed to prohibit the act in question under certain penalties, another and greater difficulty occurs, and that is to ascertain what these penalties are. They are to be the same in the language of the act, as are provided by law for the inspection of merchandise imported into the United States upon which duties are imposed. That penalties may be fixed by a reference to those which have already been established for other offences, is not disputed. The question here is, whether the designation be so certain as to enable the court to discover what penalties were intended to be embraced by it?—Before effect be given to this part of the law, it must be ascertained what penal-

ties are provided by law "for the inspection of goods brought into 'the United States." To aid us in this research, the court is referred to the 50th section of the act to regulate the collection of duties. It was natural to expect, therefore, that some provision would be here found relating to such inspection, but instead of this, it contains only a regulation as to the time and manner of landing goods, and the penalties for landing them in any other way. The word inspection is not found in the whole section. Before, therefore, it can be said that these. are those to which the appellant is become subject, the court must be satisfied that landing and inspection are convertible terms, which they are not pretended to be. Goods may be inspected and yet never landed—or they may be landed without any previous inspection, and not forfeited. To obviate this difficulty, the court is desired to bear in mind that the term "inspection" has two significations—that it means the particular inspection or examination which certain articles, such as spirits, wines, and teas undergo—and also, that general superintendence and care which take place on the part of the revenue officers on the arrival of every vessel with a cargo in the United States. If it be used in these different senses, how is the court to ascertain in which it is to be taken here? If in the first sense, which is its most usual and appropriate signification, then other sections of the collection law must be those which are referred to, where the penalties for neglect of inspection, or rather for landing without such inspection, are very different from those prescribed by the 50th section for landing in the night, or without a permit. If the latter sense be adopted, in order to give effect to a penal statute, of such doubtful import, it is not seen how it will bring home to the appellant the penalties of this section, which is relied on, one offence against which is the landing, even with an ordinary permit in the night time, which if done under the inspection and view of every officer of the customs, would not save the property from confiscation. It is certain that this section is silent as to any kind of inspection, and that a forfeiture might accrue under it, although every species of inspection mentioned in the collection law had been performed. It is the want of a special or common permit, as the case may be, not the want of inspection, which makes the landing an offence. The court, therefore, cannot, without great hazard of mistake, select from a law of great length, containing no less than one hundred and twelve sections, and a very great variety of provisions and penalties, any particular part, where the reference is so uncertain, and apply it to the case of the appellant.

It is said that more prosecutions are depending for forfeitures under this clause of the law, than for any other violations of the embargo laws. This, while it is an incentive to greater caution, furnishes some proof that the law has not generally been understood in the sense now put upon it. For certainly these laws might have been broken at much less hazard, and with greater prospect of impunity.

It was also mentioned that in several of the districts the law had received this interpretation. Without a full report of these decisions, it is impossible to say on what grounds the courts proceeded—or where these appear on the record, the sentence may have passed sub silentio, or by default. In the case of U. S. v. The William and Samuel [Case No. 16,701], from the district court of Pennsylvania, it is admitted there was no argument on this point; so that this sentence can afford no evidence of the opinion of the learned judge who presides there; whose decisions are in such general and high estimation, and will always receive the most respectful consideration from this court.

Upon the whole, it is so doubtful whether any offence were created by this section of the act of the 25th of April, 1808; and still more so, what are the penalties for its commission, if any were created, that the court cannot persuade itself there is ground for this prosecution. The sentence of the district court must therefore be reversed.