## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

## AT MACON,

### FEBRUARY TERM, 1848.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

No. 18.—JAMES NEAL and others, plaintiffs in error, vs. KERRS and HOPE, defendants in error.

[1.] The 4th Section of the Act of 1827, providing for the recording of deeds and mortgages, and defining the lien of the same, declares, that "upon failure "to record any mortgage, as hereinbefore required, within the time or times "hereinbefore specified, for recording the same, that then, and in such case, all "judgments obtained before the foreclosure of the said mortgage, and also any "mortgage executed after the same and duly recorded, shall take lien on the "said mortgaged property, in preference to the said mortgage." *Held*, that the junior mortgagee, *with notice* of the prior lien, gains no preference by having his mortgage recorded.

Notice; Lien; This was a rule *nisi vs.* the sheriff, to pay over money. Tried before Judge FLOYD, in Pike Superior Court, August Term, 1847.

For the facts of the case, the reader is referred to the opinion delivered by the Supreme Court.

CHAPPELL and GIBSON, for the plaintiffs in error, relied upon the following authorities. 4 *Kent's Comm.* 168. 4 *Paige's R.* 215. 3 *Atk. R.* 646. 10 *Johns. R.* 460. 15 *Johns. R.* 566 *to* 569. 18. *Johns. R.* 544. 19 *Johns. R.* 281. 19 *Wend. R.* 515. 20 *Wend. R.* 18, 19. 2 *Sug. on Vend.* 254. 2 *Powell on Mortgages, ch.* 14, *page* 571. *Prince's Dig.* 165, 166, 158. 2 *Bailey's R.* 315. 1 *McCord's R.* 265.

STARK, for the defendants in error.

*By the Court*—LUMPKIN, J. delivering the opinion.

On the 20th day of January, 1838, Jeptha V. George executed a mortgage on Nelson, a negro fellow, to James Neal, to secure the payment of a promissory note for $2500, which was recorded on the sixth day of July of the same year. On the eighth day of April, 1842, James Neal foreclosed his mortgage and caused an execution to issue thereon, which, on the 27th day of September, 1844, was levied on Nelson, and on the first Tuesday in February thereafter, said slave was sold for the sum of $890.

On the 6th day of November, 1840, the said George made and delivered to Kerrs and Hope, his note for $1716 94, and on the 14th day of April, 1841, executed his certain other note to Kerrs and Hope, for $816 67, which last note was credited with the sum of $264 35. On the 7th day of April, 1842, George made and delivered to Kerrs and Hope his deed of mortgage to secure the payment of the last named note, on Nelson and other property therein mentioned. This last mortgage was recorded on the day it was executed, and foreclosed the following day, and the mortgagee took out execution thereon.

Both mortgages were foreclosed on the same day. It was in proof, however, that the foreclosure of Kerrs and Hope was prior in point of time in that day. It was also in testimony that George gave notice to Kerrs and Hope of the existence of Neal's mortgage on the same property before he executed the last mortgage to them.

[1.] The question for us to decide is, which of these liens is entitled to the money arising from the sale of Nelson?

It will be necessary to ascertain how the law stood prior to 1827; and what change was made by the act of that year.

By the common law, livery of seisin was necessary to pass a freehold estate. The object was to give notoriety to the transaction and thus prevent imposition. Afterwards lands became transferrable by *bargain* and *sale,* and the statute of uses, transferring the possession to the use, the ceremony of livery of seisin was dispensed with, and subsequent creditors and purchasers were liable to be injured for want of publicity in the change of the ownership of property. To remedy this mischief and to prevent clandestine conveyances, it was enacted by the 27 Hen. VIII. that

such *bargains* and *sales* should not enure to pass a freehold unless the same be made by indenture and enrolled within *six months* in one of the courts of Westminster Hall or with the *custos rotulorum* of the county where the manors lie. The reason of this statute is apparent. It was to furnish a substitute for livery of seisin, which had in effect been dispensed with. The public required some convenient method of obtaining knowledge in respect to the titles to property, and hence the origin of this act of enrolment. Registration afforded this means of information, and was constructive notice to all concerned, and much more certain and effectual than the old ceremony of livery of seisin, which was known only to the actual spectators. And what was the construction put upon this act of Parliament, we learn from the opinion of Lord Hardwicke in the case of *Le Neve vs. Le Neve*, 1 *Ambler*, 442. He there says, that ever since its passage, if a subsequent bargainee has notice of a prior, he is equally affected with that notice, as if the prior purchase had been a conveyance by feofment and livery.

And why should it not be? The whole design is to give notice to purchasers and creditors, so as to save them from being defrauded by conveyances of which they are ignorant. If they are notified, however, *in any way*, of the existence of these prior conveyances, the end of the law is accomplished, and they cannot complain.

Next followed the statute of 7th *Q. Anne*, the preamble to which recites in substance, "That by different and secret ways of convey- "ing lands, &c., such as are ill-disposed have it in their power to "commit frauds, and frequently do so, by means whereof several "persons have been undone in their purchases and mortgages by "prior and secret conveyances and fraudulent incumbrances." Then comes the enacting clause which declares, "That every un- "registered conveyance shall be adjudged fraudulent and void "against any subsequent purchaser or mortgagee for valuable con- "sideration, unless the memorial thereof be recorded in the manner "therein prescribed before the registering of the memorial of the "deed, under which such subsequent purchaser or mortgagee "shall claim."

Under this Registry Act, it has always been assumed as a conceded point, that notice of the prior deed would supersede the effect of the prior registry. The case of *Le Neve vs. Le Neve*, already referred to, was decided by Lord Hardwicke, in 1747, and con-

tains the fullest illustration, as well as the most conclusive vindica-tion of the doctrine, and has stood as a beacon-light to the courts both of Great Britain and this country ever since. What, asks the Chancellor, appears by the preamble to be the intention of the act? Plainly to secure subsequent purchasers and mortga-gees against prior secret conveyances and fraudulent incumbran-ces. "Where a person," he says, "had no notice of a prior convey-ance, there the registering his subsequent conveyance shall pre-vail against the prior; but if he had notice of a prior conveyance, then, that was not a *secret conveyance,* by which he could be preju-diced. This act gives, it is true, to the subsequent purchaser or mortgagee, the *legal estate;* but it does not say that he is not left open to any equity which a prior purchaser or incumbrancer may have; for he can be in no danger when he knows of another in-cumbrance, because he might then have stopped his hand from proceeding. The operation, both of this Act and that of 27th Hen. VIII, and the construction of them, are the same; and it would be a most mischievous thing, if a person, taking advantage of a legal form, appointed by an act of Parliament, might, under that, protect himself against a person who had a prior equity, of which he had notice."

The Chancellor next reviews the three leading cases which had been decided on the Register Act, namely, *Forbes vs. Nelson,* (4 *Bro. P. C.* 189,) *Blades vs. Blades,* (1 *Eq. Ca. abr.* 358,) and *Chevall vs. Nicholls,* (1 *Str.* 564,) and concludes that the ground upon which they all went was plainly this, that the taking a legal estate, after notice of a prior right, makes a person a *mala fide* purchaser. That it is a species of fraud and *dolus malus* itself. For he knew the first purchaser had the clear right of the estate, and after knowing that, he takes away the right of another per-son by getting the legal estate. Fraud or *mala fides,* therefore, is the ground on which the Court is governed in the cases of notice.

In the case of *Blades vs. Blades,* (1 *Eq. Ca. abr.* 358,) Lord King (who Lord Hardwicke has pronounced as great a stickler for the common law as ever sat in Westminster Hall) declares, "The subsequent purchaser having notice of the first purchase, was bound by it, though not registered, and his getting his own deed first registered was a fraud. The design of these acts being on-ly to give parties notice, who might otherwise without such regis-try, be in danger of being imposed on by a prior purchase or

mortgage, which they are in no danger of, when they have notice in any manner, though not registered." And in 1 *Sch. & Lef.* 159, Lord Redesdale says, "the intention was to make priority of registry, the criterion of title to all intents and purposes. But this does not exclude anything which effects the conscience of the party himself who claims under the registered deed. It never was the intention of the Legislature, to give a priority of right to commit a fraud; but its meaning was, that parties dealing fairly, priority should be given to him who had the registered instrument." And in 2 *Ridgway's P. C.* 428, it was declared by the House of Lords, that " every case upon the Register Acts, both in England and Ireland, which had been brought before a Court of Equity, had been determined on this ground, that these acts do not affect the great fundamental principles of equity, but that every purchaser claiming under a registry deed, is left open to any equity, which a prior purchaser or incumbrancer may have."

By 4 and 5, *W. & M.*, it is provided that "no judgment not docketed and entered in the book directed to be provided and kept for that purpose, shall affect any lands and tenements as to purchasers and mortgagees, yet the doctrine of *notice* has been held by the Courts, applicable to this statute, by analogy to the Registry Act. 2 *Eq. Ca. abr. Thomas vs. Pledwell,* 16 *Ves.* 419.

Our colonial Act of 1755, it will be recollected, was passed just eight years after the decision of Lord Chancellor Hardwicke, in *Le Neve vs. Le Neve.* It cannot be doubted that the doctrines of this case were known to the Provincial Legislature; and that the same reasons, which induced the enactment of the Statute of Enrolment, the Registry Act, and the Act of W. and M., caused the introduction of our Statute. By it, all mortgages and other conveyances were to be registered, within the space of sixty days from their dates; on failure of which all such as are lawfully and regularly recorded, within the time directed by the Statute, were to be deemed, taken and construed to be prior, and were to take place and be recoverable in law, before any deed, conveyance or mortgage which had not been duly registered. *Prince,* 158.

Could language be more explicit, as to the preference given to the legal estate of the junior incumbrancer? And yet it never was supposed by any Court in Georgia, but that this Act must have the same construction, put upon the Registry Acts of Eng-

land, in reference to the principle of equity resulting from notice. And that if the junior incumbrancer had knowledge of the prior lien, before he had parted with his property or money on the credit of the estate, and before he had united the subsequent equity with his legal title, he was not considered as entitled to protection, as against the prior equity. That those who had notice, notwithstanding they come within the letter of the statute, did not come within its equity, and as against them the equitable rights of the prior incumbrancer have always been preferred, although the formalities of the statute have not been complied with. The Courts will not suffer one to retain the legal advantage he has thus obtained, to the prejudice of another.

It is insisted by counsel for the defendants in error, that no evidence of notice *dehors* the statute, can be received, because the only competent notice is the registration of the deed. And this is true, so far as the legal title is involved; but the equitable title of the unrecorded mortgagee may be communicated in any other way, and this knowledge, however obtained, is binding on the junior mortgagee.

The Registry Acts of almost every State in the Union, are similar in substance to our own; and their Courts have with great unanimity adopted the same rule maintained here for nearly a century, holding that an unregistered deed is good against a subsequent conveyance with notice—notice being equivalent to registration. 5 *Greenl.* 369. 4 *New Hamp. Rep.* 262. 2 *Verm. Rep.* 13. 5 *Con. Rep.* 468. 14 *Mass. Rep.* 300. 19 *Wend. Rep.* 339. 1 *Paige*, 127. 3 *Ham.* 527. 1 *Breese*, 34. 16 *Martin's Lou. R.* 368. 10 *Watts*, 412. *Walker's Rep.* 168. 2 *Harris & G.* 415. 1 *Dev. Eq. Rep.* 110. 4 *Halst.* 193. *Harper*, 295. 4 *J. J. Marsh*, 293. 3 *Leigh*, 365.

Many of the cases here cited, and others which I have examined, are parallel in every particular with the one at bar, and they all hold the same language, to-wit: that a subsequent incumbrancer *mala fide*, (which means with notice,) is not within the purview of the law, nor intended to be protected; for the law never intends to give sanction to fraud, or to render a fraudulent act legal.

Chancellor Kent, after noticing the French Ordinance of 1747, framed by d'Aguesseau, and which laid it down as a fixed rule, that not even the most actual and direct notice would countervail

the want of registration, remarks, " A more reasonable doctrine prevails in the English and American law ; and it is a settled rule, that if a subsequent purchaser or mortgagee, whose deed is registered, had notice at the time of making his contract, of the prior unregistered deed, he shall not avail himself of the priority of his registry to defeat it ; and the prior unregistered deed is the same to him, in cases where the conduct of the first mortgagee is fair, as made as if it had been registered. His purchase is justly considered, in bad faith ; and it would ill comport with the honor of the law, and the wisdom of the administration of justice, that Courts should blind their eyes to such fraudulent dealing, and suffer it to remain triumphant. If the second purchaser has in fact notice, the intent of the registry is answered, and to permit him to hold against the first purchaser, would be to convert the statute into an engine of fraud. A Court of Equity must have its moral sense, " wrapped up in triple brass," to be able to withstand such an appeal to its justice."

Was the act of 1827 designed to introduce some new element into this well-established principle of equity ? The second section requires mortgages to be recorded within *three months* from their date, instead of sixty days. The fourth section provides "that upon " failure to record any mortgage as therein required, within the " time specified for recording the same, in such case all judg- " ments obtained before the foreclosure of said mortgage, and also " any mortgage executed after the same and duly recorded, shall " take lien on the said mortgaged property, in preference to the " said mortgage."

Is there anything in the words of this statute which indicates an intention in the Legislature to change the old law as to mortgage ? We do not perceive it. The terms of it are precisely the same, in substance, with its predecessor. And it is to be presumed that the General Assembly were familiar with the construction of the Courts, both in England and in this State, upon the language used in the act. Had any alteration been intended, some suitable expression would have been employed for that purpose. The preference given to the junior incumbrancer would have been absolute, *with* or *without notice*—thus negativing the right of the Courts to interfere on the ground of fraud.

Does this construction make void the law? By no means. Some rule had to be prescribed by the Legislature, where there

was a conflict between a prior unrecorded mortgage and a junior mortgage registered within time; in that event, it is declared that the former shall be postponed. And the wisdom and propriety of this enactment none will doubt. The legislation of conveyances has occupied a prominent place in the municipal regulations of every government. The object has invariably been to protect those who part with their money or property upon the faith of a deed, supposing they were getting a good title or legal lien, and without notice such as would induce them to believe that there was any previous incumbrance that would defeat such title or lien. But I cannot for a moment believe that the Legislature intended to give priority to one who has full notice of the existing lien, and whose purpose is to defeat it by taking advantage of the inadvertence of the older mortgagee. I admit that laws are made to subserve the vigilant. May it not be one of the faults of the times that we have become too *sleepless ?* We are not only sufficiently wakeful to protect our own rights, but I have sometimes thought—perhaps unjustly—that we are too ready to profit by the *laches* of our fellow creatures, whether it be the result of carelessness or kindness. At any rate, I am unwilling to relax a rule, which may operate, to some extent at least, as a salutary restraint upon the cupidity of the age.

It may be asked, Why apply notice to the junior mortgagee, and not to the judgment creditor, seeing that these two classes are placed in juxtaposition in the statute? It is this circumstance alone, I apprehend, which creates the difficulty in the case. For had judgments been omitted, we do not perceive that the 4th section of the Act of 1827 would have introduced the slightest innovation upon the old law.

In the first place, it may be remarked that we are not now called on to construe this act in reference to judgments. Conceding, however, that they cannot be affected by notice actual or constructive, there may be a good reason for the distinction. A judgment is the act of the Court, where fraud cannot be alleged —and here the Legislature have made the priority of lien to depend upon the priority of judgment—that is, the judgment of foreclosure and the ordinary judgment; but the taking the younger mortgage is the act of the party, and it is not only viewed as done in bad faith, when attended with notice, but the Courts have ever branded it with the epithet of *dolus malus*—a wicked trick !—

Neal *vs.* Kerrs & Hope.

and so it is. And it is a maxim of the law that *fraus et dolus nemini patrocinari debent.* It is a gross and palpable violation, to say the least of it, of the golden rule, which should, and will, I trust, control all Courts, in all countries, of doing unto others as we would that they should do unto us.

But again—both a judgment and mortgage differ materially in this State and in England. All the property of the defendant here is bound from the date of the judgment, and subject to be sold under execution for the payment of the judgment debt. On the other hand, a mortgage here conveys no title to the mortgagee, and is simply a security for the debt. In treating, then, of the effects of judgments and mortgages, we cannot apply to them always the principles of the Common Law. Inasmuch, then, as no estate passes in cases of mortgage, a judgment by ordinary suit is given the preference over unrecorded mortgages, unless the latter be foreclosed first. But I forbear to pursue this argument, for I am not prepared to say that the lien of a judgment obtained with notice is not subject to the equity of a mortgage, though not recorded as required by the statute. Numerous adjudications can be adduced in support of the position that an absolute conveyance to a *purchaser*, though not recorded within the time prescribed, transfers the title to lands, free of subsequent judgments.

There is nothing novel in the principle which we are about to establish. By the statute of Frauds, no contract for the sale of lands can be enforced unless some memorandum or note thereof be in writing, signed by the party to be charged therewith, yet no doctrine is better established than that the specific performance of parol agreements will be decreed upon the ground of part performance. And the reason is, that the Courts will not permit a law which is passed to prevent frauds, to be used as an instrument of inflicting fraud.

It only remains to notice briefly one other point of the case. It is whether the question of notice is not exclusively of chancery cognizance? We think not. Courts of law have concurrent jurisdiction in cases of fraud; and the ground of interference in these cases of notice is the fraud. Chancellor Kent says, " The better opinion is in favor of the jurisdiction of Courts of law." 4. *Kent*, 173. Courts of law have always acted upon this rule. 1 *Burr.* 474. *Peake's N. P.* 190, 191. 3 *Co.* 77. The question is

raised here upon a motion to distribute money in the custody of the Court. And this being an equitable proceeding, the Court will take notice of all the equities which should bind the consciences of the applicants for the fund, and order it to be paid out accordingly.