## Case No. 14,473.

### UNITED STATES v. ATHENS ARMORY.

[2 Abb. (U. S.) 129; 1 35 Ga. 344.]

District Court. N. D. Georgia. April 3, 1868.

PRIZE—STATUTORY CONSTRUCTION — CONFISCATION —PARDON.

1. Even in determining the construction of a statute authorizing a confiscation of property for an offense by its owner, words are not to be confined to a strict technical sense, when so doing will clearly defeat the evident intent· of the statute.

2. Thus, the employment of the phrase "prize and capture," in the act of August 6, 1861 (12 Stat. 319), declaring private property used in promoting insurrection to be "lawful subject of prize and capture." does not limit the operation of the act to property taken at sea. Property found on shore, or even land itself, may be condemned under the act.

3. In prosecuting an information to enforce a seizure, under the act of August 6, 1861, issues of fact should be submitted for trial by a jury, according to the course of the common law. The act does not contemplate the determination of the facts by the judge, as in causes of admiralty jurisdiction.

[Cited in People v. Sponsler, 1 Dak. 289, 46 N. W. 463.]

4. An unqualified pardon, granted to the owner prior to the seizure of property, or the institution of any proceedings to condemn it, under the acts authorizing confiscation of property used to promote the Rebellion of 1861–65, is a bar to a judgment of condemnation.

|Cited in Carr v. State, 19 Tex. App. 635.]

Trial of an information. At March term, 1867, of this court, the district-attorney, in behalf of the United States, filed an information against certain property, real and personal, particularly described in the pleadings, and consisting·of a tract of land near Athens, Georgia with the buildings and improvements thereon, together with a great variety of articles, chiefly machinery, implements, and material for the fabrication of arms, some of the material being unwrought, and some of it advanced more or less towards completion as weapons of war. The property, of every kind, was of the value of one hundred and fifty thousand dollars; and it came to the custody of the marshal under a warrant of seizure issued on November 22, 1866, by the district-attorney. The information treated the property as having belonged, prior to the occurrence of the alleged causes of forfeiture, to Ferdinand W. C. Cook and Francis L. Cook, copartners, using ·the name of Cook Brothers, and prays, on three grounds, for its condemnation under an act of congress approved August 6, 1861, and, on

1 [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

an additional ground, for its condemnation under an act approved July 17, 1862 [12 Stat. 589]. The provisions of these acts were, in part, recited; and it was averred that the proclamations of the president therein contemplated were issued and published.

The grounds of forfeiture alleged under the act of August 6, 1861, were the following: (1) That· after the passage of said act, and after the publication of the president's proclamation in pursuance thereof, and during the late Rebellion, Cook Brothers, for one hundred and fifty thousand dollars, sold and conveyed the property to the so-called government of the Confederate States, knowingly, with intent that the same should be used and employed in aiding, abetting, and promoting the Rebellion. (2) That Cook Brothers, having on April 1, 1862, entered into a contract with the so-called Confederate States for the manufacture of thirty ·thousand rifles, did, on July 14, thereafter, to secure the sum of one hundred and fifty thousand dollars, paid in advance on said contract, make a deed of trust or mortgage to the said so-called Confederate States, covering the property now libeled; that the said Cook Brothers used and employed said property in aiding the Rebellion, and especially in manufacturing said rifles, and that said deed of trust or mortgage was executed by them, knowingly, with intent to aid the Rebellion, or to suffer the property to be used by others in aiding it. (3) That during the Rebellion, and after the act of congress and the president's proclamation, as aforesaid, the property was mortgaged by Cook Brothers· to the so-called Confederate States, knowingly, with intent to employ the same, or suffer it to be employed, in aiding the Rebellion; and that the said so-called Confederate States, in consideration of such mortgage, paid them one hundred and fifty thousand dollars, which they received with intent that it, too, should be used in aiding the Rebellion, or by persons engaged in the Rebellion.

The ground of forfeiture alleged under the act of July 17, 1862, was as follows: "That Cook Brothers did not, within sixty days after the publication of the president's proclamation conveying the warning provided for by said act, cease to aid, countenance, and abet the Rebellion, and return to their allegiance to·the United States, but that they contracted to manufacture, and did manufacture upon the land and with the machinery and implements described in this information, a large number of rifles for the so-called Confederate States, receiving, to that end and for that purpose, certain advances and sums of money, and did sell and deliver said rifles to the so-called Confederate States in accordance with the contracts, mortgages, deeds of trust, and conveyances before mentioned, 'with the intent and purpose aforesaid.'"

After the filing of the information, Francis

L. Cook, as survivor of Cook Brothers, his copartner, Ferdinand W. C. Cook, having departed this life on December 11, 1864, appeared and interposed a claim to said property, asserting thereby his right to the same. He answered both the information itself and sundry special interrogatories propounded to him by the district-attorney. From these answers, which were uncontradicted, it appeared that Cook Brothers were workers in iron, and from the year 1854 to April, 1862, had their establishment in New Orleans, La. It was there that, on April 1, 1862, they entered into the contract set forth in the information, with the so-called Confederate States, for the manufacture of thirty thousand rifles. From New Orleans they removed to Selma, Alabama, where they remained for a short time, and where the deed of trust referred to in the information was executed by them, not, however, directly to the so-called Confederate States, but to a disinterested individual as trustee, and not affecting the whole of the property embraced in the information, but only a part of the machinery and implements. It was made to operate as a mortgage, and as such, to secure the said so-called Confederate States for an advance of one hundred and fifty thousand dollars in so-called Confederate currency. From Selma they removed to Athens, Ga. They there, in August and December, 1862, and January, 1863, by different deeds and in several parcels, acquired title to the land proceeded against by this information, some of which was paid for out of the above mentioned advance; and said advance was further secured by a mortgage upon the whole property, real and personal, executed in Georgia by Cook Brothers to the so-called Confederate States, on October 7, 1862. A similar mortgage, to secure another advance of one hundred thousand dollars in like currency, was executed in Georgia, on January 5, 1864. The buildings upon the land, except a mill, were erected by Cook Brothers, in the years 1862 and 1863, and cost three hundred thousand dollars in Confederate currency. They were paid for in part out of the advances already mentioned, and in part with funds derived from other sources. They were made and used chiefly, though not exclusively, for the manufacture of arms. At least two-thirds of the machinery, tools, &c., in the establishment, were on hand in and prior to the year 1861. Additions costing about seventy-seven thousand dollars in Confederate currency, were made thereto in the three following years, and, like the land and buildings, were paid for in part out of the advances of currency made by the so-called Confederate States. Upon the premises, and with the machinery and implements covered by this information, the manufacture of arms was carried on by Cook Brothers, both members of the firm knowing of the same, and consenting thereto. They delivered, at Athens, to the government of the so-called Confederate States, between three thousand eight hundred and four thousand rifles, believing that the same were to be employed in the war then going on against the United States; and the Confederate currency received by them in the years 1862, 1863, and 1864, from said pretended government, amounted to over six hundred thousand dollars. This was for rifles, horse-shoes, repairing old guns, &c., &c., with an admitted balance in favor of said government, at the time of its overthrow, of sixty-nine thousand one hundred and four dollars, in said currency.

Coupled with the foregoing facts, the claimant's answer contained a formal denial of the motives, purposes, and intent charged in the information, and averred, on the contrary, that all these things happened in the course of business transactions—Cook Brothers being engaged simply in their ordinary vocation, and actuated solely by the desire of gain and the hope of legitimate profit. The claimant, also, in bar of the information, pleaded the pardon of the president, bearing date December 11, 1865. He exhibited said pardon with proof that he accepted it on the day after its date, and of his having taken the oath of amnesty on the 29th of November preceding.

H. S. Fitch, U. S. Atty.

W. Dougherty and William H. Hull, for claimant.

ERSKINE, District Judge. This is a proceeding in rem, instituted in this court at the March term, 1867, by the district-attorney, "who prosecutes for the United States and an informant," to confiscate and condemn certain real and personal property, situate in Clark county, in this district, and known as the "Athens Armory." The information contains four counts: three are founded on the act entitled "An act to confiscate property used for insurrectionary purposes," approved August 6, 1861 (12 Stat. 319); and the fourth, on the act entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes," approved July 17, 1862 (12 Stat. 589.)

Section 1 of the act of August 6, 1861, is as follows: "If during the present or any future insurrection against the government of the United States, after the president of the United States shall have declared, by proclamation, that the laws of the United States are opposed, and the execution thereof obstructed, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the power vested in the marshals by law, any person or persons, his, her, or their agent, attorney, or employee, shall purchase or acquire, sell or give, any property of whatsoever kind or description, with intent to use or employ the same, or suffer the same to be used or employed, in aiding, abetting or promoting such insurrec-

tion or resistance to the laws, or any person or persons engaged therein; or if any person or persons, being the owner or owners of any such property, shall knowingly use or employ, or consent to the use or employment of the same as aforesaid, all such property is hereby declared to be lawful subject of prize and capture wherever found; and it shall be the duty of the president of the United States to cause the same to be seized, confiscated, and condemned." Section 2: "Such prizes and capture shall be condemned in the district or circuit court having jurisdiction of the amount, or in admiralty in any district in which the same may be seized, or into which they may be taken and proceedings first instituted."

During the discussion of this case, various and very opposite views were presented by counsel, as to the sense in which the words "prize" and "capture," and the phrase "prizes and capture," as used in this act, are to be understood. But, I apprehend, that on a careful reading of the whole statute, the question will not prove difficult of solution. For, whether these naval and military terms —here evidently intended to include, not only seizures of property water-borne, but seizures of land, and of property found on land—were incautiously introduced into the statute, is not a matter for critical examination. No one can read this law, without learning from its entire perusal, that it was the controlling purpose of congress, in enacting it, to make it one of the means to suppress the Rebellion. Therefore, it is obvious, that it could not have been in the mind of congress to confine these words or terms to their technical meaning exclusively; for "prize means maritime captures only—ships, and cargoes taken by ships." 2 Dod. 446.

Statutes must not be so construed as to produce a result different from what was intended by the lawgiver. Limit the term "prize" or "capture," as here employed, to a strict technical import, and the statute fails of its object, and becomes an absurdity; for, in many instances. cases have arisen fairly embraced within its purview, wherein the intention of the legislature would be defeated, if these terms were restricted to their narrow sense. This act was passed to confiscate property—"any property of whatsoever kind or description"—used or employed (after warning by proclamation), in aid of the Rebellion; whether the contaminated property be found afloat, or on shore, or even if it be land itself.

A brief synopsis of such portions of the act of July 17, 1862, as were invoked in argument, may be given: Section 5 declares, that "to insure the speedy termination of the present Rebellion, it shall be the duty of the president of the United States to cause the seizure of all the estate, property," &c., of the persons therein named, and to apply and use the same, and the proceeds thereof, for the support of the army.

The next section provides for the seizure of all the estate, &c., as in the preceding one, of persons "other than those named as aforesaid," who being engaged in armed rebellion, or aiding or abetting the same, shall not, within sixty days after public warning and proclamation. cease to aid, countenance, and abet such rebellion, and return to their allegiance.

The seventh declares that "to secure the condemnation and sale of any such property, after the same shall have been seized," proceedings in rem, in the name of the United States, shall be instituted in any district court thereof, in which the property or any part of it may be found, or into which the same, if movable, may first be brought, and the proceedings "shall conform, as nearly as may be, to proceedings in admiralty or revenue cases;" and if said property, whether real or personal, shall be found to have belonged to a person engaged in rebellion, or who has given aid and comfort thereto, "the same shall be condemned as enemies' property, and become the property of the United States," &c.

This act also makes all sales, transfers, and conveyances of any such property null and void; "and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described," in the fifth or sixth section.

The capture, or—more accurately—the seizure before the court, consists of realty, and of personalty found on land. A capture, in technical language, is a taking by military power; a seizure, a taking by civil authority; and it is upon the latter mode of gaining possession that the district-attorney has counted in the information.

These statutes, being laws to work forfeitures, or confiscations of property, are within that class which requires a close construction. But notwithstanding the rule, that in statutes of this kind, the intention is to be attained by strict interpretation, it is nevertheless the duty of the judge to give full expression to the legislative will,—"to ascertain which will," says Bishop (1 Cr. Law, § 231). "is the great end of all interpretation." U. S. v. Eighty-Four Boxes Sugar, 7 Pet. [32 U. S.] 453; The Enterprise [Case No. 4,499]; U. S. v. Wigglesworth [Id. 16,690]; Taylor v. U. S., 3 How. [44 U. S.] 197; Attorney General v. Radloff, 10 Exch. 84.

Both acts are simply municipal laws; consequently, the government cannot demand, nor the claimant oppose, the confiscation of any of the property covered by the information, by force of the law of nations; each must rely for success on the statutes alone. In the source from whence they spring, and in their effect, as real or personal statutes, they differ essentially from those laws which regulate the intercourse of independent or foreign nations.

The district-attorney, in replying to the question made by the counsel for the claim-

ant as to the proper mode of procedure and trial to be adopted in the adjudication in this case, said: "The proceedings for condemnation, under the act of August 6, 1861, of such 'prize and capture,' should conform to proceedings in admiralty causes; and such," continued the counsel, "has been the construction placed upon the act by the United States court of Alabama, in similar cases."

I have not been favored with the perusal of any ruling of the federal courts for Alabama, on this question. This I regret. But after a careful resolving of the statute itself, I am constrained to entertain the opinion, that neither in its words nor in its essence does it warrant the conclusion, that in seizures of land, or of property seized on land, the proceedings for condemnation should conform to proceedings in admiralty, further than what may be necessary, in a suit in rem, to initiate the cause and shape it for trial.

The principles governing the district courts of the United States in the determination of seizures of this kind are in accordance with the common law, and the trial has, hitherto, been in pursuance of the manner of the English exchequer on informations in rem, where the decision of issues of fact devolve on a jury. This court cannot undertake to say that the national legislature, in passing this statute, contemplated the expansion of the jurisdiction of the admiralty, so far beyond what was understood and intended by it at the time of the formation of the constitution, as to withdraw from the suitor, in a seizure like this, the right of a trial by jury, and to transfer the determination of the cause to the breast of a single judge. U. S. v. The Betsey, 4 Cranch [8 U. S.] 443; Six Hundred and Fifty-One Chests of Tea v. U. S. [Case No. 12,916]; U. S. v. Fourteen Packages [Id. 15,-151]; The Sarah, 8 Wheat. [21 U. S.] 391.

Section 9, chap. 20 of the judiciary act conferred [1 Stat. 76], inter alia, on the district courts, exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, and of all seizures on land and on water, and of all suits for penalties and forfeitures incurred under the laws of the United States, "saving to suitors, in all cases, the right to a common law remedy, where the common law is competent to give it." And Mr. Justice Field, in delivering the opinion of the supreme court of the United States, in the case of The Moses Taylor, 4 Wall. [71 U. S.] 411, gave the following comprehensive exposition of this reservation: "It is not a remedy in the common law courts, which is saved, but a common law remedy. A proceeding in rem, as used in the admiralty courts, is not a remedy afforded by the common law; it is a proceeding under the civil law. When used in the common law courts, it is given by statute."

The judiciary act confined the original cognizance of suits for penalties and forfeitures to the district courts exclusively. But the act of August declares, that property used or employed for insurrectionary purposes shall be "lawful subject of prize and capture wherever found," and that "such prizes and capture shall be condemned in the district or circuit court having jurisdiction of the amount;" thus bestowing upon the latter court concurrent original cognizance with the district court, when the amount is sufficient. And if the district court for this district proceed by virtue of the circuit court powers bestowed on it by act of August 11, 1848 [9 Stat. 280], the course of proceeding and trial must, on principle, be the same as in the district court proper.

Counsel on both sides admitted that the proceedings and trial, under the act of July, to condemn this property should be in accordance with the common law.[2]

I would here remark that if the views which I have expressed on the act of August are erroneous;—if, under this statute, the procedure and trial in seizures like this, instead of being in pursuance of the rules of the common law, should be in conformity to those of the admiralty or civil law;—then a peculiar anomalous jurisdictional diversity arises, and opposite modes of trial follow; the first three counts in the information would be decided by the judge alone, and the fourth by a jury.

During the discussion of some of the foregoing questions, the court intimated that the trial for the condemnation of this property must be according to the course of the common law. The counsel then agreed to dispense with the intervention of a jury, under section 4 of the act of March 3, 1865 (13 Stat. 501), for the purpose of casting the trial of the issues of fact upon the court; and to effect this, they filed a stipulation with the clerk, as required by that section of the act.

But to impose the trial and determination of issues of fact on the court, two things are necessary: (1) It must be a civil case. (2) It must be pending in a circuit court. Under the act of August, as remarked, the proceedings, without regard to amount, may be instituted in the district court, and, concurrently with it, in the circuit court, when the amount is sufficient to give the latter jurisdiction; while all proceedings under the act of July must be brought in the district court.

This is, as already observed, a proceeding in rem; an information filed by the district-attorney, ex-officio, who prosecutes for the United States and an informer, to enforce the condemnation of realty, and of personalty seized on land. The act of August provides that the attorney-general, or district attorney, "may institute proceedings of condemnation;" but the name or the nature of the remedy to be adopted in effectuating the condemnation is not given; and, therefore, what is a proper remedy can be inferred only from the spirit of the statute and its evident object.

The act of July, however (to which informers are unknown), is more definite. It de-

2 [From 35 Ga. 344.]

clares that, "to secure the condemnation and sale of any such property, after the same shall have been seized, so that it may be made available for the purposes aforesaid, proceedings in rem shall be instituted in the name of the United States in any district thereof," &c.; "which proceedings shall conform as nearly as may be to the proceedings in admiralty or revenue cases."

For the government, it was said that these statutes are remedial laws, and clearly distinguishable from penal or criminal statutes. Whereas, on the part of the claimant, it was insisted that they are criminal laws, and that the confiscation inflicted by them is a punishment for crime; and further, that an information in rem is not a suitable remedy by which to invoke a judgment of confiscation.

Whether these statutes are remedial laws, as contra-distinguished from penal or criminal enactments, is an intricate and perplexing question—inwrapped in doubt, and difficult to determine so as to satisfy the judicial mind. They are of a nature peculiar to themselves, and cannot, I think, be assigned to any particular department of jurisprudence.

By the district-attorney these acts were likened also to revenue laws. The argument failed to convince. Mr. Justice Grier, in pronouncing the decision of the court in Francis v. U. S., 5 Wall. [72 U. S.] 338, remarked that the act of August 6, 1861, "is not an act for the collection of revenue." What was there said will apply with still greater force to the act of July 17, 1862.

Counsel for the claimant contended that confiscations under these statutes are in no manner different from forfeitures of enemy property in times of war; and that the law of nations is the touchstone for construing them. To this argument the Prize Cases, 2 Black [67 U. S.] 635, would seem to furnish an answer.

In ulterior consequences, these statutes appear to me to resemble those laws enacted by some of the states during the War of Independence, by which the estates of persons absenting themselves from the country, lapsed, or escheated, or were otherwise forfeited to the people. Gilbert v. Bell, 15 Mass. 44; Borland v. Dean [Case No. 1,660].

After the careful perusal of the acts of August and July, I am inclined to be of the opinion, that there are some portions of each which may be found to possess a nearer affinity to criminal law, than to remedial jurisprudence. But the question will receive no discussion, as a decision upon it is not essential. If, however, it were necessary to decide it, some aid might be gathered from the case of Fisher v. McGirr, 1 Gray, 1.

Under the act of August, the offense stamps itself primarily on the property,—that is the offender: and its forfeiture is the consequence of the act of the owner in knowingly using it, or consenting to its employment for illegal purposes. His trans-

gression—in acquiring or disposing of property with intent to use or employ it, or to suffer it to be used or employed, in aiding, abetting, or promoting rebellion; or, being the owner of property, knowingly using or employing or consenting to the use and employment of it as aforesaid—is the point upon which the confiscation turns. But under the act of July, the offense impresses itself primarily on the owner,—he is the offender; and the forfeiture of his property is a penalty inflicted for his crime. And, under this last act, it is not necessary, to work the forfeiture, that the property be adherent to the Rebellion.

Concurrent with, and explanatory of this statute, congress passed a joint resolution, which, inter alia, provides as follows: "Nor shall any punishment or proceeding, under said act, be construed so as to work a forfeiture of the real estate of the offender beyond his natural life." 12 Stat. 627.

It was insisted on behalf of the claimant, that these statutes are unconstitutional and void; and, if not so, that they expired with the Rebellion. But as the claimant, among other matters relied on by him, has, to his claim and answer, superadded a plea of pardon, the court is relieved from considering either of those propositions.

As to the question raised, whether the proceeding instituted by the government to confiscate this property is a civil suit or a criminal proceeding. Mr. Justice Story, in an anonymous case [Case No. 444], said: "But it is not true that informations in rem are criminal proceedings. On the contrary, it has been solemnly adjudged that they are civil proceedings." And see The Palmyra, 12 Wheat. [25 U. S.] 1.

The case of U. S. v. La Vengeance, 3 Dall. [3 U. S.] 297, was an information filed by the district-attorney, founded on a statute prohibiting the exportation of arms and ammunition. It was argued that the proceeding was of common law jurisdiction, and a criminal cause. But the court held it to be of admiralty jurisdiction. And Chief Justice Marshall, in the course of the opinion, said: "In the next place, we are unanimously of opinion that it is a civil cause; it is a process in the nature of a libel in rem; and does not, in' any degree, touch the person of the offender." These cases were in admiralty.

Notwithstanding the action in rem may be deemed a civil proceeding, yet it is held to be a proper remedy to enforce a forfeiture incurred under the provisions of a penal statute. U. S. v. Eighty-Four Boxes of Sugar, supra. See 2 Pars. Mar. Law, 682; Attorney General v. Radloff, supra.

This last case arose on an information filed to recover penalties for smuggling. Counsel for defendant proposed to call the defendant himself as a witness on behalf of the defense, under an act allowing parties, in civil cases, to testify on their own behalf. The crown objected, and the objection was al-

lowed. A rule nisi followed, and it was heard before the court of exchequer.

The point in judgment was under an act of parliament declaring that "all penalties or forfeitures incurred or imposed by this or any other act relating to the customs, or to trade or navigation, shall and may be sued for. &c., by action of debt, plaint, bill, or information," &c. Martin and Platt, BB., held, that the information filed under this section was not a criminal proceeding, and, therefore, the defendant was improperly rejected. But Parke, B., and Pollock, C. B., decided that it was a criminal proceeding. Said the former: "An information by the attorney-general for an offense against the revenue laws, is a criminal proceeding—it is a proceeding instituted by the crown for the punishment of a crime—for it is a crime and an injury to the public to disobey statute revenue law, and, accordingly, the old form of proclamation, made before the trial of informations for such offenses, styles these offenses 'misdemeanors.' " The opinion of Pollock, C. B. (who tried the case below), was to the same effect.

The court being equally divided, the rule was dropped, and, consequently, the decision at nisi prius remained undisturbed.

But it has already been seen that these statutes are not revenue laws. They are, in fact, the fruit of a more vigorous exertion of the powers of the government than takes place in passing laws simply for the collection of revenue. The general object of revenue laws is merely the collection of duties and taxes, though they may impose fines and work forfeitures of property.

In the first count of the information it is alleged, that after the passage of the act of August 6, 1861, and after the promulgation of the president's proclamation in pursuance thereof, and during the Rebellion, Cook Brothers, for one hundred and fifty thousand dollars, granted, bargained, sold, and conveyed the property embraced in the information, to the so-called Confederate government, knowingly, with intent that the same should be used and employed for insurrectionary purposes. In the other counts, based on this statute, it is alleged that Cook Brothers mortgaged this property to the so-called Confederate government, after the passage of the act and the publication of the proclamation, knowingly, and with intent that it should be used and employed in aiding and promoting the Rebellion. I have carefully examined all the conveyances relied on by the district-attorney, and find them to be, in every instance, deeds of mortgage.

Now, if the rule of the common law prevailed in this state, the legal title would undoubtedly have passed to the so-called Confederacy; but here a mortgage is a mere security for the debt, and nothing more.

In Davis v. Anderson, 1 Kelly, 176, the court said, that "a mortgage in Georgia is nothing more than a security for a debt, and

the title in the mortgaged property remains in the mortgagor until foreclosure and sale in the manner pointed out by the statute." Other cases followed to the same effect. 4 Ga. 169; 10 Ga. 66, 300; 27 Ga. 389. In Jackson v. Carswell, 34 Ga. 279, the same court, in express terms, per Walker, J., affirmed Davis v. Anderson. So this question, in the doctrine of mortgages, may be considered as settled in Georgia.

Mr. Justice Davis, in pronouncing the opinion of the supreme court of the United States in the case of Chicago v. Robbins, 2 Black [67 U. S.] 418, said: "Where rules of property in a state are fully settled by a series of adjudications, this court adopts the decisions of the state courts." See Id. 428.

It is in evidence that Ferdinand W. C. Cook, of the late firm of Cook Brothers, died in 1864. The surviving partner, Francis L. Cook, interposes, and claims the legal title to the property before the court. In his claim and answer to the information, and likewise in his responses to certain special interrogatories propounded by the government, he confesses that, upon the premises, and with the machinery and implements, the manufacture of arms for the so-called Confederate government was carried on by Cook Brothers, both members of the firm knowing of the same, and consenting thereto, and believing that the arms were to be used and employed in the war then going on against the government of the United States.

He adds to the foregoing confession a formal denial of the motives, purposes, and intent charged in the information, and avers that all these things happened in the course of business transactions, Cook Brothers being workers in iron, and engaged simply in their ordinary vocation, and actuated solely by the desire of gain, and the hope of legitimate profit.

But that Francis L. Cook cannot thus purge himself of the offenses just confessed, —voluntarily fabricating arms for the so-called Confederate government, and believing at the very time, that they would be employed in levying war against his country; and knowingly using and consenting to the employment of the property covered by the information, for insurrectionary purposes,—is a principle of the criminal law too well established to bear discussion. Respublica v. McCarty, 2 Dall. [2 U. S.] 86; U. S. v. Vigol, Id. 346; Ex parte Bollman, 4 Cranch [8 U. S.] 75, 126.

In addition to the many matters discussed during the hearing of this cause, the district-attorney alluded to a balance admitted by the claimant to be due by him to the rebel government, at the date of its downfall, amounting to sixty-nine thousand one hundred and four dollars, in "Confederate treasury notes." But this question cannot be adjudicated in a suit in rem.

The claimant interposed a plea in the nature of a plea of pardon, alleging that par-

don was granted to him by the president of the United States, on December 11, 1865, and prior to the issuing of the warrant of arrest.

In his plea, he alleges that the president granted to him (using the words of the grant) "a. full pardon and amnesty for all offenses by him committed, arising from participation, direct or implied, in the Rebellion," —adding an averment, that he has performed all and singular the conditions therein contained, and prays judgment and a writ of restitution.

The pardon was produced, and inspected by the court. It contains the following conditions, to wit: (1) That he shall take the oath prescribed by the president in his proclamation of May 29, 1865. (2) That he shall never acquire any property whatever in slaves, nor make use of slave labor. (3) That he shall "first pay all costs accrued in any proceedings instituted or pending against his person or property before the date of the acceptance of this warrant." (4) That he "shall not by virtue of this warrant, claim any property, or the proceeds of any property that has been sold by the order, judgment, or decree of a court under the confiscation laws of the United States." (5) That he shall notify the secretary of state, in writing, that he has accepted said pardon. A copy of the acceptance was annexed to the plea, and bears date December 12, 1865.

In proceeding to inquire into the legal effect of this pardon, it may be borne in mind that the documentary proofs show that it was granted on December 11, 1865, accepted on the ensuing day, and the proper officer notified. That the warrant of arrest was issued on November 22, 1866, and very shortly thereafter the property was seized by the marshal; and at the March term, 1867, of this court, the district-attorney filed the information.

It is manifest from the language of the pardon itself, without resorting to construction, that the executive, by this warrant or grant to Francis L. Cook, not only forgave and buried in oblivion all offenses by him committed, arising from participation, direct or implied, in the Rebellion; but also clearly intended to restore to him all his confiscable property. Observe the words, found in the premises, — "full pardon and amnesty," — words the most comprehensive and potent that could be employed to carry out this intention. And if the grantee has performed all conditions precedent, and has not violated any of the conditions subsequent, then all the right, title, and immunities bestowed by the grant, vested, and continue vested in him; and—if the charter of pardon be construed agreeably to the laws of this state— in his heirs.

If this last conclusion is sound, it may be assumed—provided the conditions subsequent, in the pardon, were affirmative conditions, and not personal and inseparable from the grantee—that had he died before complying with these conditions, his heirs could come in and comply; premising, of course, that the forfeitures or confiscations imposed under the provisions of these statutes, extend beyond the life of the grantee. This question might arise under the act of August, but not under the act of July, unless personal estate is included in the term "forfeiture" as understood in section 3 of article 3 of the federal constitution. And this proposition is equally as applicable to personal representatives as to heirs. Sir Edward Phitton's Case, 6 Coke, 79b, is in point. Sir Edward was outlawed at the suit of one R. after judgment, and before the general pardon of 43 Eliz.; and after the pardon Sir Edward died. The court held, that his executors could avail themselves of the pardon, and have the benefit of it; and this, too, whether executors or administrators were named in it or not. Citing Lord Mordant's Case, Cro. Eliz. 294.

A pardon is an act of mercy flowing from the fountain of bounty and grace; its effect, when it is a full pardon, is to obliterate every stain which the law attached to the offender, to place him where he stood before he committed the pardoned offense, and to free him from the penalties and forfeitures to which the law had subjected his person and property:—"to acquit him," says Sir William Blackstone, "of all corporal penalties and forfeitures annexed to the offense for which he obtains his pardon." 4 Comm. 402.

"A pardon," says Lord Coke, "is a work of mercy, whereby the king, either before attainder, sentence or conviction, or after, forgiveth any crime, offense, punishment, execution, right, title, debt, or duty, temporal or ecclesiastical. All that is forfeited to the king by any attainder, &c., he may restore by his charter." 3 Inst. 233d.

King v. Greenvelt, 12 Mod. 119. Motion to discharge Dr. Greenvelt from a fine, pro mala praxi. It was urged, that the king having granted the fines to the college, he could not by his own pardon destroy his own grant; and that the fines remained notwithstanding. But per curiam, seriatim: "The penalty pro mala praxi, is only a satisfaction to the public justice, and not to the party, who had his action on the case; and that whenever a crime is pardoned, all the effects and consequences thereof are discharged; that when an act of parliament appoints a fine for a public offense, such fines, of common right, belong to the king, unless they are otherwise particularly disposed; that the king, by granting away his fines, does not extinguish his power of pardoning, for that would be an extinguishment of his prerogative by implication; and the power of pardoning being inseparably annexed to the crown, and not grantable over, the king therefore pardoning this offense, before the fine actually imposed, whereby an interest would have vested in the grantee, the offense

was thereby gone, and the penalty pending thereon discharged."

In Ex parte Wells, 18 How. [59 U. S.] 307, it was said by a distinguished jurist,—Mr. Justice Wayne,—in pronouncing the opinion of the court, that "when the words, to grant pardon, were used in the constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the colonies. * * * We must, then, give the word the same meaning as prevailed here and in England, at the time it found a place in the constitution."

Mr. Justice Field, in delivering the opinion of the court, in Ex parte Garland, 4 Wall. [71 U. S.] 333, said: "A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense."

Although laws are not framed on principles of compassion for guilt; yet when Mercy, in her divine tenderness, bestows on the transgressor the boon of forgiveness, Justice will pause, and, forgetting the offense, bid the pardoned man go in peace.

Judgment: On hearing the above cause, and having inspected the charter of free and full pardon granted by the president of the United States, on December 11, 1865, (before any judicial proceedings had been instituted in court for the condemnation of the property covered by the information), to Francis L. Cook, the claimant, and by him pleaded in bar of these proceedings, it is considered and adjudged by the court here, that the said plea of the claimant be allowed, and that this cause be dismissed, and it is so ordered. The court adjudges nothing further.