# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 23, 2022

Lyle W. Cayce
Clerk

No. 21-11157

United States of America,

*Plaintiff—Appellee*,

*versus*

Ruel M. Hamilton,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-83

Before King, Elrod, and Southwick, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Ruel Hamilton gave money to members of the Dallas City Council. He received nothing tangible in return. He was later indicted under 18 U.S.C. § 666 for two counts of "bribery concerning a local government receiving federal benefits," plus a conspiracy count under § 371. The question here is whether federal-programs bribery under § 666 requires a *quid pro quo*. We conclude that it does. We thus VACATE Hamilton's convictions and REMAND for proceedings consistent with this opinion.

No. 21-11157

I.

Hamilton is a real-estate developer in Dallas who is known for his involvement in local politics.  One local politician he supported was Carolyn Davis, who was a member of the Dallas City Council.  Among the councilmembers, she served as the Chair of the Dallas Housing Committee.  Several times between 2013 and 2015, Hamilton gave money to a non-profit called "Hip Hop Government" (HHG), which focused on combining "hip-hop culture with Government."  That non-profit was owned and operated by Davis's close friend (and campaign manager), Jeremy Scroggins.  Some of those donations were used for HHG's legitimate purposes; others were purportedly given to HHG, cashed by Scroggins, then given to Davis personally.  Hamilton also teamed up with Davis to support other city-council candidates in the 2015 election cycle:  He gave money to her preferred candidates and gave her cash to help pay for those candidates' workers.

Right around that 2015 election cycle, Hamilton was trying to secure some low-income-housing tax credits for one of his real-estate ventures, the Royal Crest project.  These tax credits were offered not by the City of Dallas, but by the Texas Department of Housing and Community affairs (a state agency).  The City Council would eventually vote to "recommend" a slate of projects to the state agency for these tax credits.  Davis, for her part, lobbied to have the Royal Crest project included among those projects.  Sure enough, Royal Crest made the cut, and the City Council passed a resolution recommending a handful of real-estate developments to the state agency for these tax credits.  With that resolution came a promise:  If the state agency signed off on the tax credits, the City would help fund those projects to the tune of $2.7 million.  Alas, the state agency did not grant any low-income-housing tax credits to any of the real-estate projects the City Council recommended.

A few years later, Hamilton needed to get a paid-sick-leave ordinance on the ballot in the upcoming election.  Though he *did* like the ordinance for its own sake, he really wanted it on the ballot because he knew it would increase the voter turnout (which would ostensibly help his preferred candidates).  He first tried to get the ordinance on the ballot by collecting voters' signatures, but he did not get enough signatures in time.  The only other way to get it on the ballot was through a vote by the City Council, and the City Council could not vote on it unless the Mayor put the ordinance on the agenda to discuss.  So Hamilton called Dwaine Caraway, another member of the Dallas City Council.

Caraway was busy at the time.  Unfortunately for Hamilton, Caraway was in the middle of signing some plea documents with the FBI over roughly $500,000 he had taken in kickbacks and bribes in another case.  When Caraway saw the missed call, he showed the FBI agents.  The FBI agents, who were "simply trying to find out what it was that Mr. Hamilton" "wanted from Mr. Caraway," told Caraway to call Hamilton back so they could record the phone call.  Caraway called, Hamilton made a brief pitch about the ordinance, Caraway said that he was having health problems, and then Caraway suggested that they meet in person.  They met the next day (which the FBI videoed).

At the meeting, Caraway began by calling his mother on speakerphone and lamenting about her health issues.  He mentioned that he would visit her that day to handle some of her "healthcare" paperwork and that he would "pay all that stuff today."  After that call ended, Caraway and Hamilton bantered about how busy and tired Caraway was.  They switched gears and began discussing the paid-sick-leave initiative and how that vote may come out if it was put on the agenda by the Mayor.  After talking a bit about how he operates his business with paid leave and health insurance, Hamilton began peppering Caraway with praise: "I don't know for sure if you're going to run

again [but] I hope you do"; "I think you've been doing an extraordinary job in your district. I want you here and I think that you and I can get a lot of stuff done. I really do."; "Before you leave office or whenever your last term is, we're going to have stuff built down there on Eleventh Street. You just watch. I need you for that."

Then Hamilton left the door open for the ask: "What I'm saying is, I'm there, you know, and so if there is anything that I can help you with, I mean, I hope you feel like you can reach out." Caraway took that opportunity to imply he needed some cash:

> Caraway: Well, I'm going to tell you something, I'm reaching out to-day. . . . I got to go find me $6,200 today. Man, let me tell you something, trying to survive in this -- in this and not campaign stuff, not campaign at all, it's -- it's difficult, man.
>
> Hamilton: Yeah.
>
> Caraway: I mean, I'm -- I'm dealing with so much s***, I -- I'm ready to -- I'm about -- look here, my hair's gray, I'm tired, I'm bleeding out my a**, I'm just telling you straight up, my health is bad. This is pretty -- this is -- this has been a tough struggle, you know, and I want things to happen down here.

After a little more cajoling by Hamilton, and a little digression about a real-estate project that Caraway and Hamilton both wanted to see completed, Hamilton circled back and asked how he could help. Caraway responded: "You can answer that bill that I just threw out there . . . for about [$6,200] today and that will help me . . . do what I need to do." Hamilton happily obliged: "Can I just write a check to Dwaine Caraway?" Caraway clarified that this was not a loan, and that it had nothing to do with the campaign, he just had to "go pay for my mama." Hamilton penned the check for $7,000 and "wrote something down" in the memo line "for posterity['s] sake," so that if "somebody ever asks, I can come up with some kind of reference."

Shortly thereafter, a grand jury indicted Hamilton on two counts of federal-programs bribery relating to his dealings with Caraway and Davis. Caraway pleaded guilty shortly after meeting with Hamilton for taking bribes and kickbacks in an unrelated case. Next went Davis, who took a deal pleading guilty for "conspiring" with Hamilton to commit federal-programs bribery. According to Hamilton, Davis intended to withdraw her guilty plea because she only did so out of fear, and she purportedly told others that Hamilton "did not do anything wrong" and "did not pay her any bribes." Tragically, however, Davis was killed in a car crash after being hit by a drunk driver, and thus that plan never came to pass. Just after Davis died, Scroggins took a deal and pleaded guilty to one count of misprision of a felony, agreeing to cooperate against Hamilton.

The government then secured a superseding indictment for Hamilton. Beyond the two substantive federal-programs-bribery counts under 18 U.S.C. § 666, the superseding indictment added (1) a count of conspiracy to violate § 666, alleging a conspiratorial agreement between Hamilton, Davis, and Scroggins, 18 U.S.C. § 371, and (2) a count for violating the Travel Act, 18 U.S.C. § 1952, relating to Hamilton's phone call with Caraway. In the lead-up to trial, Hamilton stipulated that "the City of Dallas" was a "local government" that "received in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of Federal assistance."

After a litany of pre-trial motions, Hamilton went to trial. Over two weeks, the jury heard from Hamilton that (1) he knew not what Davis and Scroggins did with his donations, and (2) his funding of Davis's preferred candidates was totally above-board. As to Caraway and the paid-sick-leave initiative, Hamilton argued that the money he gave Caraway was purely him helping a friend out. The government provided evidence to the contrary, including: the video of Hamilton and Caraway's meeting; recordings of his

No. 21-11157

phone calls with Davis; testimony from Scroggins about his handling of the funds for Davis; surveillance video of Hamilton withdrawing $5,000 in cash with Davis in the car; and the various checks Hamilton wrote to Davis's preferred candidates with the names of family members or employees in the memo line. Scroggins's testimony about what Davis told him was allowed in under the co-conspirator hearsay exception; Davis's exculpatory statements about Hamilton, however, were deemed inadmissible, despite Hamilton's protestations that they were admissible statements against Davis's penal interest.

In giving the jury instructions for the federal-programs-bribery counts, the district court (over Hamilton's objections) told the jury that neither a *quid-pro-quo* exchange nor any "official act" by the councilmembers was required. Along those lines, the district court also said nothing about what of Hamilton's activity received protection by the First Amendment. The court also declined to give an instruction on entrapment as to Hamilton's phone call and meeting with Caraway.

The jury convicted Hamilton on the two substantive § 666 counts and the one conspiracy count, but acquitted Hamilton on the Travel Act count. After sentencing, he appealed. While his appeal was pending, the district court pushed back the date which Hamilton was set to report to the Bureau of Prisons for health reasons. Hamilton then asked our court for release pending appeal, which a single judge of our court denied. After oral argument, as his report date was looming, Hamilton renewed his motion for release pending appeal. We granted that motion because, after having had the benefit of briefing and oral argument, we concluded that Hamilton raised sufficiently substantial issues justifying his release pending appeal. We now turn to the issues raised in this appeal.

## II.

When a jury-instruction challenge "hinges on a question of statutory construction," our review is *de novo*. *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013). We review the propriety of jury instructions for an abuse of discretion. *United States v. Naidoo*, 995 F.3d 367, 378 (5th Cir. 2021); *United States v. Whitfield*, 590 F.3d 325, 347 (5th Cir. 2009). An instruction is *not* an abuse of discretion if, all things considered, the instruction "is a correct statement of the law" and it "clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (internal quotes omitted). But it *is* an abuse of discretion "to apply an erroneous view of the law." *United States v. Ayelotan*, 917 F.3d 394, 400 (5th Cir. 2019).

Hamilton raises many arguments for why his conviction was unlawful, but we need only reach the first. The district court believed that § 666 criminalized mere gratuities and did not require a *quid pro quo*. Our court has not yet had the opportunity to address this question. We conclude that § 666 does, in fact, require a *quo*; a *quid* alone will not suffice. And the jury instruction that the district court gave did not convey that. Thus, Hamilton's convictions must be vacated.

## A.

Section 666 criminalizes bribery concerning programs receiving federal funds. It provides in relevant part:

> **(a)** Whoever, if the circumstance described in subsection (b) of this section exists—
>
> …
>
> **(2)** corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of

No. 21-11157

> an organization or of a [local government], or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

> shall be fined under this title, imprisoned not more than 10 years, or both.

> **(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, or other form of Federal assistance.

18 U.S.C. § 666(a)–(b).[1]

Section 666 grew out of a circuit split over another law. The general bribery statute, 18 U.S.C. § 201, applied to "public official[s]." Percolation of cases applying that statute led courts to a problem: Does the term "public official" include state and local officials? The Supreme Court granted certiorari in a case to resolve the split over this issue, *Dixson v. United States*, 465 U.S. 482 (1984), but once it did, Congress enacted § 666 to "extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds," *Salinas v. United States*, 522 U.S. 52, 58 (1997).

Section 201 has two distinct subsections. Subsection (b) covers bribery, which "requires a showing that something of value was corruptly

---

[1] We agree that the government satisfied subsection (b), § 666's "jurisdictional element," with the stipulation and the evidence presented to the jury.

No. 21-11157

given, offered, or promised to a public official" with the intent "to influence any official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999) (quoting 18 U.S.C. § 201(b)). Subsection (c) covers illegal gratuity, which "requires a showing that something of value was given, offered, or promised to a public official" "for or because of any official act performed or to be performed by such public official." *Id.* (quoting 18 U.S.C. § 201(c)).

When Congress passed and President Reagan signed what would become 18 U.S.C. § 666, it had only one subsection. It criminalized something like what is in subsection (c), the illegal-gratuity provision, with its "for or because of" language. *See* Comprehensive Crime Control Act, Pub. L. No. 98–473, § 1104(a), 98 Stat. 1837, 2143–44 (1984). Two years later, Congress changed that provision by swapping out the "for or because of" language for language like § 201(b), with its "intent to influence" verbiage, and it added a requirement that the giving be done "corruptly." *See* Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. No. 99–646, § 59, 100 Stat. 3592, 3612–13. Sections 201 and 666, in pertinent part, now look like this:

| 18 U.S.C. § 201 | 18 U.S.C. § 666(a)(2) |
|---|---|
| (b)(1)(A): "directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . with intent to influence any official act [by such official]" | "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of [a local government]" |
| (c)(1)(A): "directly or indirectly gives, offers, or promises anything of value to any public official . . . for or because of any official act performed [by such official]" | |

No. 21-11157

For maximum prison time under each: federal-official bribery under § 201(b) carries a maximum of fifteen years, 18 U.S.C. § 201(b); federal-programs bribery under § 666(a) carries a maximum of ten years, *id.* § 666(a); illegal gratuities under § 201(c) carries a maximum of two years, *id.* § 201(c).

### B.

As hinted at above, the Supreme Court has spoken to the substance of § 201, albeit focused on the federal illegal-gratuity provision in § 201(c). *Sun-Diamond* was about a trade association which gave the Secretary of Agriculture certain items of value. 526 U.S. at 401–02. An independent counsel determined that the association's giving of those gifts violated the illegal-gratuity provision of § 201(c)(1)(A). *Id.* at 401. Though the indictment alluded to some matters before the Secretary in which the association had an interest, it "did not allege a specific connection between" the gratuities and the matters before the Secretary. *Id.* at 402. The question presented was whether the illegal-gratuity provision "require[d] any showing beyond the fact that a gratuity was given because of the recipient's official position." *Id.* at 400.

The Court said yes, something more was required. *Id.* at 406–07. In reaching that conclusion, the Court discussed subsections (b) and (c) and how they interact. *Id.* at 404–05. The difference between the two was intent: bribery requires an intent to influence; illegal gratuity requires "only that the gratuity be given or accepted 'for or because of' an official act." *Id.* at 404. In other words, bribery requires a *quid pro quo*—"a specific intent to give or receive something of value *in exchange* for an official act"—illegal gratuity does not. *Id.* at 404–05. Subsection (c) covers an illegal gratuity that is "merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405. The Court went on to narrowly construe § 201(c) and say

that a gratuity is not illegal if it is given merely because of the public official's office; instead, the government "must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414.

Key for our purposes, in describing what language in the bribery provision made it apply only to a *quid pro quo*, the Court focused on the language requiring that something of value be *corruptly* given to a public official with *intent to influence any official act*. *Id.* at 404–05; *cf.* 18 U.S.C. § 666(a)(2) (whoever "corruptly gives" "anything of value to any person[]" with intent to influence or reward an agent [of a local government]" violates this subsection).

## C.

Despite the similarities between § 201(b) and § 666(a), a lopsided split has emerged about whether § 666(a) criminalizes *both* bribery *and* illegal gratuities. On one side of the issue is the First Circuit, which held that § 666(a) criminalizes only a *quid pro quo* and not mere gratuities. *United States v. Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013); *see also id.* at 39–40 (Howard, J., concurring in part) (concluding that "because it is ambiguous whether [§ 666] criminalizes gratuity," under the rule of lenity, "the defendants cannot be convicted for giving or receiving a gratuity"). Likewise, the Fourth Circuit in *dicta* expressed agreement with the approach eventually taken by the First Circuit. *United States v. Jennings*, 160 F.3d 1006, 1015 & nn.3–4 (4th Cir. 1998). The Second, Sixth, Seventh, Eighth, and Eleventh Circuits have concluded that § 666(a) covers both bribery and illegal gratuities. *See, e.g.*, *United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018); *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997); *United States v. Zimmerman*, 509 F.3d 920, 927 (8th Cir. 2007); *United States v. McNair*, 605

F.3d 1152, 1188 (11th Cir. 2010). The Fifth Circuit has not yet had occasion to address this question.

Of the circuits that interpret § 666 to cover gratuities and bribery, two themes emerge. First, most view the "corruptly gives" language as: (a) a limiting principle which keeps the statute from encompassing *all* gifts to local officials; and (b) an intent requirement which *quid pro quo* is sufficient, but not necessary, to satisfy. *See, e.g.*, *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009) ("[W]hile a '*quid pro quo* of money for a specific . . . act is sufficient to violate the statute,' it is 'not necessary.' Rather, it is enough if a defendant 'corruptly solicits' 'anything of value' with the 'inten[t] to be influenced or rewarded in connection' with some transaction involving property or services worth $5000 or more." (quoting *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005); 18 U.S.C. § 666(a)(1)(B))). Second, most have considered significant the word "reward" in § 666, as (they say) it implies that § 666 criminalizes something other than an intent to *influence*; thus, the "reward" language must be about gratuities. *See, e.g.*, *Ganim*, 510 F.3d at 150 ("[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity." (citation omitted)). Those courts have also said, as § 666 relates to § 201, that: § 201 is a "markedly different statute" than § 666, *id.* at 521; § 201 is "an entirely different statute" than § 666, *Porter*, 886 F.3d at 565; and "§ 666 sweeps more broadly than either § 201(b) or (c)" because § 666 "does not say 'official act'" or "'in return for' or 'because of' but says 'in connection with,'" *McNair*, 605 F.3d at 1191.

The First Circuit reads § 666 differently. Relying on *Sun-Diamond*, the plain text of § 666, and the context in which it was enacted, the court in *Fernandez* held that "gratuities are not criminalized under § 666." 722 F.3d at 26. The court began by tracing § 666's lineage back to § 201, noting that the former flowed from the latter. *Id.* at 20–22. It then discussed the

amendment in 1986, which changed the language to read more like § 201(b) by adding the "corruptly" language and adding the "with intent to influence or reward" language (while removing the "for or because of" language like § 201(c)). *Id.* at 21–22.

Under the First Circuit's approach, "the word 'reward' does not create a separate gratuity offense in § 666, but rather serves a more modest purpose: it merely clarifies 'that a bribe can be promised before, but paid after, the official's action on the payor's behalf.'" *Id.* at 23 (quoting *Jennings*, 160 F.3d at 1015 n.3). The "influence" and "reward" terms would then each have their own meaning, the court said: "influence" would be for payment *then* action; "reward" would be for promise, action, *then* payment. *Id.* "Both of these situations involve a *quid pro quo*, and both therefore constitute bribes. What matters, of course, is that the *offer* of payment precedes the official act." *Id.* That approach made more sense to the court, for a few reasons: (1) limiting § 666 to bribery "would help to explain the presence of the 'corruptly' language in § 666(a)(1)(B) and (a)(2)," as that word appears in the federal-bribery provision but *not* the federal-gratuity provision; (2) if Congress made giving illegal gratuities to federal officials punishable by imprisonment for two years, it does not make sense that the same would be punishable by imprisonment for *ten* years for *local* officials who have some connection to federal funds; and (3) it is unlikely that § 666's two subsections covers all of what § 201's four subsections do, and if it only covers either bribery or gratuities, the language is closer to § 201(b)'s bribery provision. *Id.* at 24–25.

## D.

We believe that the First Circuit has the better approach under the plain language of § 666(a). Other than the word "reward," § 666 tracks closely with § 201(b)'s bribery provision, with the matching "corruptly" and

No. 21-11157

"intent to influence" language. *Cf. Jarkesy v. SEC*, 34 F.4th 446, 455 (5th Cir. 2022) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947), for the proposition that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it"). These similarities compel a similar result: both § 201(b) and § 666(a) cover only *quid pro quo* bribery. *Sun-Diamond*, 526 U.S. at 404. As for "reward," as noted in *Fernandez*, it is plausible that Congress included that term to prevent a situation where a thing of value is not given until *after* an action is taken. 722 F.3d at 23. Thus, our approach does not read the term "reward" out of the statute, as it continues to serve a valuable purpose under certain circumstances. *Latiolas v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (*en banc*) (The anti-surplusage canon encourages courts to give effect to "all of [a statute's] provisions, so that no part will be inoperative or superfluous, void or insignificant."). We are convinced that, by its plain terms, § 666(a) applies only to *quid pro quo* bribery.[2]

---

[2] In the alternative, under the rule of lenity, we must resolve all reasonable doubts about the meaning of § 666 in Hamilton's favor. *See Shular v. United States*, 140 S. Ct. 779, 787 (2020); *see also, e.g.*, *Wooden v. United States*, 142 S. Ct. 1063, 1081 (2022) (Gorsuch, J., concurring) (Under the rule of lenity, "any reasonable doubt about the application of a penal law must be resolved in favor of liberty."); *The Enterprise*, 8 F. Cas. 732, 734 (C.C.D.N.Y. 1810) (No. 4,499) ("If it be the duty of a jury to acquit where such doubts exist concerning a fact, it is equally incumbent on a judge not to apply the law . . . where he labours under the same uncertainty as to the meaning of the legislature."); Thomas Z. Horton, *Lenity Before* Kisor: *Due Process, Agency Deference, and the Interpretation of Ambiguous Penal Regulations*, 54 Colum. J.L. & Soc. Probs. 629, 632–33, 640–44, 664–66 (2021) (discussing lenity's historical provenance and explaining that the canon applies when the meaning of a penal statute or regulation is subject to "reasonable doubt"). To the extent there is some doubt about the meaning of § 666, the rule of lenity compels us to resolve it in Hamilton's favor. *Jarkesy*, 34 F.4th at 459 n.9 ("[A]lternative holdings are binding precedent and not obiter dictum." (quotation omitted)).

No. 21-11157

Not only does that make sense, it makes the rest of the context surrounding § 666 make sense: Congress started out including language in § 666 like the federal illegal-gratuity provision in § 201(c), but quickly amended it to language far closer to the federal bribery provision in § 201(b); Congress's decisions about maximum punishments for bribery of a local official is below the fifteen-years' imprisonment for federal-official bribery, but higher than the two-years' imprisonment for illegal gratuities; and Congress's interest in federal officials taking bribes is higher than its interest in local officials (with some connection to federal funds) doing the same. Thus, all signs point toward the sensible conclusion that § 666 is more like § 201(b), and that Congress meant for § 666 to be similarly limited.

For these reasons, we conclude that § 666 applies only to *quid pro quo* bribery. That is enough to decide this case and we go no further.[3]

III.

Because § 666 requires a *quo*, there is the problem with the district court's instructions to the jury. In its view, § 666 did "not require *quid pro quo* bribery," and because the statute does not explicitly distinguish between bribery and mere gratuities, the court did not instruct the jury that a *quid pro*

---

[3] Lurking just beneath the surface is a hoard of constitutional problems raised by a broad reading of § 666. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 247 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt."). Treating § 666 as though it covers all sorts of interactions with local public officials raises First Amendment, federalism, and due-process concerns. *See McDonnell v. United States*, 136 S. Ct. 2355 (2016); *McCormick v. United States*, 500 U.S. 247 (1991). As one of our colleagues put it, when § 666 is used to "prosecute purely local acts of corruption," it is arguably unconstitutional because it is not "necessary and proper to carry into execution [Congress's] spending power." *United States v. Lipscomb*, 299 F.3d 303, 364–77 (5th Cir. 2002) (opinion of Smith, J.). We need not reach those issues in this case because we can construe the text in a way that comports with the Constitution.

15

*quo* was required.  Hamilton properly objected to this at that time, arguing that such an instruction was necessary under § 666(a).  The government now contends that, even if *quid pro quo* is required, the court's instruction was sufficient because it tracked the language of the statute.   While the government is correct that a statute-tracking instruction is often enough, the instruction must also "clearly instruct[] jurors as to the principles of law applicable to the factual issues confronting them." *Freeman*, 434 F.3d at 377. The government cites *Whitfield* for the proposition that a jury instruction is fine, even without *quid pro quo* language, if it "sufficiently conveyed the essential idea of give-and-take."  590 F.3d at 353 (quotation omitted).  But in *Whitfield*, there was no concern about whether a payment was a gratuity or a bribe—*i.e.*, there was no debate about whether the payor got something in return; the only debate was about whether, when the payment was made, the payor and local official had in mind what the *quo* would be. *See id.*  Here, the government proceeded on a gratuity theory and only now says that it could have won either way.

The district court gave no instruction as to the meaning of "intent to influence or reward," or that it requires a *quid pro quo* (because, of course, it did not think one was required), and its definition of "corruptly" said nothing about a formal this-for-that.  And if a very capable and experienced district judge did not believe that the language of § 666 required a *quid pro quo*, it is hardly clear that lay jurors would have understood that based on the text alone.   The lack of such a *quid pro quo* instruction rendered the jury instructions unclear, as the jurors were permitted to convict on an illegal-

No. 21-11157

gratuity theory that does not exist in § 666.[4]   That is enough to justify vacating Hamilton's conviction.[5]

* * *

Section 666 criminalizes only a *quid pro quo*, not mere gratuities.  The district court's instruction allowed the jury to convict based on mere gratuities.  For these reasons, we VACATE Hamilton's convictions and REMAND for proceedings consistent with this opinion.

---

[4] As Hamilton notes, the Travel Act count *did* require a *quid pro quo*, and the jury acquitted Hamilton on that count.  Instructing the jury on one count that a *quid pro quo* was required but not others may have further communicated that no *quid pro quo* was required for the § 666 counts.

[5] We also alternatively conclude that Hamilton was entitled to an entrapment instruction, which would otherwise lead to the vacatur of his second substantive count of bribery.  We review the denial of an entrapment instruction *de novo*. *United States v. Gutierrez*, 343 F.3d 415, 419 (5th Cir. 2003).  Viewing the evidence in the light most favorable to Hamilton, we conclude that he made a *prima facie* showing (1) that he lacked the predisposition to bribe Caraway, and (2) that the government was involved in the operation beyond merely making the opportunity available to him.  *See United States v. Stephens*, 717 F.3d 440, 444 (5th Cir. 2017).  Indeed, the district court candidly observed that not giving the instruction "could be reversed."  As a result, Hamilton's second substantive § 666 conviction would be vacated regardless of the preceding discussion about *quid pro quo* and § 666.  *See Jarkesy*, 34 F.4th at 459 n.9.

17