# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 15, 2025

Lyle W. Cayce
Clerk

No. 24-10515

United States of America,

*Plaintiff—Appellee*,

*versus*

Richard Hall,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CR-623-1

---

Before Elrod, *Chief Judge*, and Jones and Stewart, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Richard Hall wanted in on the lucrative market for compounded drugs. Federal insurers paid well. He and his partners built a pharmacy, hired marketers, and found doctors to write prescriptions. The money flowed. But so did the fraud. The government charged Hall with paying illegal kickbacks to secure prescriptions, laundering the proceeds, and defrauding federal healthcare programs under the Anti-Kickback Statute ("AKS").

A grand jury indicted him. A jury convicted him. The district court sentenced him to 52 months' imprisonment and ordered him to pay more

than $59 million in restitution. Hall now appeals. For the reasons that follow, we AFFIRM.

## I.

Richard Hall reconnected with an old classmate, Dustin Rall, at a 2012 golf tournament. Their conversation turned to compounding pharmacies. Rall needed a licensed facility to mix prescription drugs. Hall's father, Lewis Hall, was a pharmacist struggling to sell his business. To them, the solution seemed clear: repurpose the pharmacy for compounding.

By 2013, Hall, Rall, Lewis, and Scott Schuster formed Rxpress. Each played a role—Hall handled compliance, his father oversaw pharmacy operations, Rall managed finances, and Schuster led marketing. The business model relied on existing physician networks. Schuster expanded outreach, recruiting marketers to promote the pharmacy's compounded drugs. The four each identified high-reimbursement formulations, secured prescriptions, and billed both private and federal insurers.

A year later, the group restructured. They launched a second pharmacy, Xpress Compounding, after consulting legal counsel. The plan was strategic. Rxpress would handle private insurance claims, allowing physician investment, while Xpress would process prescriptions covered by federal programs like Medicare and TriCare. This structure also allowed marketers to receive commission-based pay. If the drugs were federally reimbursed, these payments likely violated the AKS. So to avoid liability, Hall and his partners claimed they converted Xpress marketers from independent contractors to W-2 employees.

The distinction was more form than substance. Marketers for both pharmacies continued to induce physicians to write prescriptions and still received commissions tied to prescription value—in effect, kickbacks. To secure physician cooperation, the marketers offered incentives:

directorships, consulting agreements, luxury trips, and fine dining. Between 2014 and 2016, Xpress received over $59 million in federal healthcare reimbursements.

In 2018, a grand jury indicted Hall and seven co-conspirators. Charges included conspiracy to defraud the United States and to receive health care kickbacks under 18 U.S.C. § 371 (Count 1) and multiple counts of paying and receiving illegal kickbacks under 42 U.S.C. § 1320a-7b(b)(1) and (2) (Counts 2–5). A superseding indictment added charges of money laundering conspiracy under 18 U.S.C. § 1956(h) (Count 7) and substantive money laundering under 18 U.S.C. § 1957 (Count 9). The case proceeded to trial on Counts 1 through 5 and Count 7.

The jury found Hall guilty on Counts 2 through 5 and 7. The district court sentenced him to 52 months in prison, three years of supervised release and imposed restitution in the amount of $59,879,871. Hall filed a Motion for Release Pending Appeal. But the district court and this court denied his request. He subsequently appealed.

## II.

The AKS's provision at issue, 42 U.S.C. § 1320a-7b(b)(2), "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a [Federal health care program provider] for services to be paid by the [Federal healthcare] program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). Section 1320a-7b(b)(2) provides that:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

Under the AKS's safe-harbor provision, however, the statute's criminal prohibition does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." *Id.* § 1320a-7b(b)(3)(B).

## III.

Hall presses four arguments on appeal: (A) the district court erred in its jury instructions by placing the burden of persuasion on Hall to establish the safe-harbor defense under the AKS; (B) the district court erred in its jury instructions by defining "employee" related to the safe-harbor defense and rejecting Hall's proposed instruction; (C) the district court erred by refusing to include Hall's jury instruction on the recipients of the alleged kickbacks; and (D) the district court erred in imposing restitution. We address each in turn.

## A.

We begin with whether the district court erred in instructing the jury that Hall bore the burden of persuasion to establish the bona fide employee safe-harbor defense under the AKS. Hall calls this a matter of first impression

for this court. On that much, we agree. But he goes further, arguing that while he accepted the burden of production, the court wrongly placed on him the burden of persuasion, requiring proof by a preponderance of the evidence. He believes that warrants reversal. We disagree.

We generally review jury instructions for abuse of discretion. *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022). A jury instruction is not an abuse of discretion if it "is a correct statement of the law" and "clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Id.* (quoting *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (internal quotes omitted)). But a district court abuses its discretion when it "appli[es] an erroneous view of the law." *Id.* (quoting *United States v. Ayelotan*, 917 F.3d 394, 400 (5th Cir. 2019)). We also review the district court's statutory interpretation *de novo*. *See United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013).

"Hornbook criminal law distinguishes between offense elements and affirmative defenses." *United States v. Ortiz*, 927 F.3d 868, 873 (5th Cir. 2019) (citing Paul H. Robinson, CRIMINAL LAW DEFENSES: A SYSTEMATIC ANALYSIS, 82 COLUM. L. REV. 199, 291 n.164 (1982)).[1] By definition, an affirmative defense is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true . . . . The defendant bears the burden of proving an affirmative defense." Defense, BLACK'S LAW DICTIONARY (12th ed. 2024). The Supreme Court has long held that when Congress forbids an act in one provision and sets out exceptions in another, the law places no duty on the government to disprove the exception;

---

[1] *See also* Richard C. Boldt, THE CONSTRUCTION OF RESPONSIBILITY IN THE CRIMINAL LAW, 140 U. PA. L. REV. 2245, 2248 n.10 (1992) (distinguishing an affirmative defense from a missing element defense).

No. 24-10515

that burden falls to the defendant. *See Dixon v. United States*, 548 U.S. 1, 13 (2006) (citing *McKelvey v. United States*, 260 U.S. 353, 357 (1922)). Put another way, "it is incumbent on one who relies on such an exception to set it up and establish it." *McKelvey*, 260 U.S. at 357. This is "the general rule of law, which has always prevailed, and become consecrated almost as a maxim in the interpretation of statutes." *United States v. Dickson*, 40 U.S. 141, 165 (1841); *see also United States v. Haggerty*, 997 F.3d 292, 299 (5th Cir. 2021) ("It is a 'well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime.'" (quoting *United States v. Santos-Riviera*, 183 F.3d 367, 370–71 (5th Cir. 1999)).

It is an immutable principle of criminal procedure that "[t]he [g]overnment must prove beyond a reasonable doubt every fact necessary to constitute the crime." *Smith v. United States*, 568 U.S. 106, 110 (2013) (internal citations omitted); *see also* ALI, Model Penal Code § 1.12(1) (2023) ("No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt." (cleaned up)); *Id.* § 1.13(9)(iii)(c) (noting that an element of an offense means, *inter alia*, "such a result of conduct as negatives an excuse or justification for such conduct"). But the government need not prove "the nonexistence of all affirmative defenses." *Smith*, 568 U.S. at 110. Only when an "affirmative defense" negates an element of the offense does the burden remain with the government. *Id.* (quoting *Martin v. Ohio*, 480 U.S. 228, 237 (1987) (Powell, J., dissenting)). A defense does not shift the burden to the government when it "excuses conduct that would otherwise be punishable but does not controvert any element of the offense." *Id.* (quoting *Dixon*, 548 U.S. at 6.) (cleaned up).

In dicta in an unpublished, nonprecedential opinion, we have described the safe-harbor defense in the AKS as one "which the defendant

6

must prove." *United States v. Turner*, 561 F. App'x 312, 319–320 (5th Cir. 2014) (unpublished). Our sister circuits agree.[2] So do our pattern jury instructions. *See* 5th Cir. Pattern Jury Instructions (Criminal Cases) § 2.109B (2019 ed.) ("These safe harbor provisions are affirmative defenses for which the defendant bears the burden of proof." (citing *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished))). Having established this point, we turn to whether the defense negates the AKS's remuneration element.

When the meaning of a statute is unambiguous, "our inquiry begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (quoting *BedRoc Ltd., L.L.C. v. United States*, 541 U.S. 176, 183 (2004)). The text of the AKS leaves no doubt that "any remuneration[,]" given or received in exchange for referrals, is prohibited. 42 U.S.C. § 1320a-7b(b)(2). The safe-harbor provision does not rewrite that rule; it carves out a narrow exception. And Congress did not place the safe-harbor provision within the statute's main proscription. Instead, it set it apart in a separate clause, § 1320a-7b(b)(3), reinforcing that it is "incumbent on one who relies on such an exception to set it up and establish it." *McKelvey*, 260 U.S. at 357. Further, an excuse does not undo a rule; it presupposes one. The safe-harbor provision acknowledges that

---

[2] *See United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018) (holding that once the government proves an AKS violation, the burden shifts to the defendant to establish the safe-harbor by a preponderance of the evidence); *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013) (holding that the jury reasonably rejected the safe-harbor affirmative defense); *United States v. Ekwebelem*, 669 F. App'x 868, 868 (9th Cir. 2016) (unpublished) (affirming that the safe-harbor provision is an affirmative defense and rejecting the need for the government to negate all enumerated safe-harbors); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (unpublished) (holding that failure to present sufficient evidence of an affirmative defense relieves the court of any duty to instruct the jury on it (citing *United States v. Bailey*, 444 U.S. 394, 414–15 (1980) and *United States v. Sarno*, 24 F.3d 618, 621 (4th Cir. 1994))).

remuneration occurs but provides an exception where the payment is made within a legitimate employer-employee relationship. *See* 42 U.S.C. § 1320a-7b(b)(3)(B). This is the hallmark of an affirmative defense. It does not contest the government's proof of the elements. *See Smith*, 568 U.S. at 110.

Explained differently, "[o]nce the government establishes the elements of a violation of the [AKS], the burden shifts to a defendant to demonstrate by a preponderance of the evidence that her conduct fell within the safe harbor provision of the statute." *United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018) (citing *United States v. Jumah*, 493 F.3d 868, 873 (7th Cir. 2007) and *United States v. Vernon*, 723 F.3d 1234, 1269–71 (11th Cir. 2013)); *see also McKelvey*, 260 U.S. at 357. To read the statute otherwise would circumvent this "general rule of law which has always prevailed . . . ." *See Dickson*, 40 U.S. at 165. Because the AKS's safe harbor has all the earmarks of an affirmative defense, the district court did not err in placing the burden of persuasion on Hall to establish it. *See Haggerty*, 997 F.3d at 299.

We turn to the caselaw that Hall cites, which he believes supports his argument. He cites *Ruan v. United States*, 597 U.S. 450 (2022), *United States v. Haggerty*, 997 F.3d 292 (5th Cir. 2021), and *United States v. Kloess*, 251 F.3d 941 (11th Cir. 2001), to argue that the government must disprove the AKS's safe-harbor defense beyond a reasonable doubt. None of which offer refuge to his argument. *Ruan* held that the Controlled Substances Act's "knowingly or intentionally" mens rea applied to the statutory authorization exception because that exception directly shaped the scope of criminal liability under 21 U.S.C. § 841(a). *See* 597 U.S. at 457. The AKS's safe-harbor provision does no such thing; it excuses conduct that otherwise meets the statute's elements. *Haggerty* addressed 18 U.S.C. § 1152's intra-Indian carve-out, which defined the jurisdictional reach of a purely jurisdictional statute. *See* 997 F.3d at 299–302. Jurisdictional elements govern a court's power to hear a case, not the substantive elements of a crime. The AKS safe-harbor

8

provision has no such jurisdictional role. Finally, *Kloess* involved an obstruction statute where the defense of lawful, bona fide legal representation directly negated the "knowingly" mens rea element. *See* 251 F.3d at 948. The AKS's safe-harbor provision neither negates the remuneration element nor alters the required intent; it merely excepts otherwise unlawful payments if they satisfy narrow statutory criteria. None of these cases, therefore, support shifting the burden of persuasion to the government.

For all these reasons, we hold that the district court properly instructed the jury that Hall carried the burden of persuasion for the bona fide employee safe-harbor defense under the AKS.

**B.**

We next address whether the district court erred in its jury instructions defining "employee" under the safe-harbor defense and rejecting Hall's proposed instructions. Hall argues it did. Those instructions were as follows:

> [*sic*] For Counts 2 through 5, the government must prove beyond a reasonable doubt, in addition to the elements I have described in my previous instructions, that the payment or offer to pay remuneration was not made by an employer to an employee who had a bona fide employment relationship with the employer, for employment in the provision of any item or service for which payment may be made in whole or in part by TRICARE or FECA.
>
> An employer-employee relationship generally exists where the company for which services are performed—here, Xpress Compounding—has the right to control and direct the person who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection,

> it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if it has the right to do so. The right to discharge is also an important factor indicating that the company possessing that right is an employer.

We explain below why Hall's argument is misguided.

As stated, statutory interpretation is reviewed *de novo. See Garcia-Gonzalez*, 714 F.3d at 312. A district court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *See United States v. Cervantes*, 107 F.4th 459, 469 (5th Cir. 2024). An abuse of discretion occurs when a requested instruction (1) is substantively correct, (2) is not substantially covered in the charge given to the jury, and (3) concerns a key issue in the trial such that its omission seriously impairs the defense. *See id.* Still, trial judges have broad discretion in crafting jury instructions. *See United States v. Marchetti*, 96 F.4th 818, 829 (5th Cir. 2024). A district court does not err when it gives a charge that tracks this circuit's pattern jury instructions and correctly states the law. *See United States v. Richardson*, 676 F.3d 491, 507 (5th Cir. 2012).

The district court's jury charge here was not a verbatim copy of this circuit's pattern jury instructions, but it substantially followed them. It included the relevant substantive elements and the explanatory notes citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992). *See* 5th Cir. Pattern Jury Instructions (Criminal Cases) § 2.109B (2019 ed.) ("For a list of factors to consider when deciding whether the bona fide employee safe harbor provision applies, *see id.* (citing [*Darden*], 112 S. Ct. [at] 1347–48.")).

In *Darden*, the Supreme Court "adopt[ed] a common-law test for determining who qualifies as an 'employee' under ERISA." 503 U.S. at 323. The test consists of a non-exhaustive array of factors, which includes

No. 24-10515

the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323–24 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989)). Because this test, however, "contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* at 324 (quoting *NLRB. v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)).

Given this, *Darden* forecloses Hall's argument. Specifically, he argues that the district court should have instructed the jury that the "right to control is decisive." But *Darden* taught that while an employer's right to control the manner and means of work is important, it is only one factor among many in determining the employer-employee relationship. *See* 503 U.S. at 324. No single factor is dispositive. *See id.* Because of this, the district court's jury instructions were not an abuse of discretion. We hold that the charge substantially aligned with our pattern jury instructions and correctly stated the law. *See Richardson*, 676 F.3d at 507.

## C.

We consider whether the district court abused its discretion in declining Hall's proposed jury instruction on the recipients of the alleged

11

kickbacks. Hall contends the jury should have been instructed to decide whether "the recipient of the remuneration was in a position" to make referrals or purchases of healthcare goods or services, or whether the recipient "unduly influenced or acted on behalf of a person in such a position." He leans on this court's decision in *Marchetti*, 96 F.4th at 818, and its discussion of *Miles*, 360 F.3d at 472. Neither case carries his argument.

In *Marchetti*, we framed "[t]he central question" as whether the defendant's payments were intended to induce referrals or merely to compensate advertisers. 96 F.4th at 826. There, we noted that "the identity of the payee, while not essential, speaks to the intent of the payer." *Id*. But the true inquiry, we emphasized, is whether the payer "intended improperly to influence those who make healthcare decisions on behalf of patients." *Id*. at 827 (quoting *Miles*, 360 F.3d at 481) (cleaned up).

Hall seizes on this language but overlooks the context. The passage he cites concerns evidentiary sufficiency, not jury instructions. When *Marchetti* did turn to jury instructions, it rejected a similar claim. *Id*. at 829–33. The defendant there argued that the jury should have been told that percentage-based compensation is not *per se* unlawful. *Id*. at 831 We disagreed, holding that the district court's instructions were "quite clear that the payments have to be made in order to induce an unlawful referral." *Id*. The instructions given here were materially identical. *See* Final Jury Instructions at 20–21, *United States v. Marchetti*, No. 5:19-cr-25 (E.D. Tex. Dec. 16, 2021) (No. 595).

The district court here, like the one in *Marchetti*, hewed to the language of the AKS and our jury pattern instructions. It laid out each element and instructed the jury to decide whether the payments were made "to induce" referrals. That is the dividing line between lawful and unlawful conduct. *See Marchetti*, 96 F.4th at 826 ("Did [the defendant] intend to

induce referrals, which is illegal, or did [the defendant] intend to compensate advertisers, which is permissible." (cleaned up)). Given that the district court's instruction fully covered the substance of Hall's request and mirrored the instruction upheld in *Marchetti*, nothing more was required. *See United States v. Lucas*, 516 F.3d 316, 324 (5th Cir. 2008) (concluding there was no error when the given "instructions substantially covered Defendants' requested instructions"). Because of these reasons, we hold that the district court did not err by declining Hall's proposed jury instructions.

## D.

We now address whether the district court erred in imposing restitution. Hall thinks so. He argues that the district court's reliance on "relevant conduct" rather than convicted counts to determine restitution violated the Mandatory Victims Restitution Act ("MVRA"). He also asserts that the court's basis for restitution was unclear, and if it was tied to his AKS convictions, his liability should be limited to the benefit he personally received—$70,406.16—rather than the government's total loss. A restitution award based on the money laundering conviction, in Hall's view, would be improper because it was not the but-for cause of any federal loss. Again, we disagree.

We review the legality of a restitution order *de novo* and its amount for abuse of discretion. *See United States v. King*, 93 F.4th 845, 850 (5th Cir. 2024). Because Hall challenges only the legal basis of restitution, our review here is *de novo*.

The MVRA mandates restitution for defendants convicted of "an offense against property." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The MVRA defines a "victim" of such an offense as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered

> including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2). Under this definition, members of a conspiracy may be held jointly and severally liable for all foreseeable losses within the conspiracy's scope, even if a specific loss cannot be attributed to a single conspirator. *See King*, 93 F.4th at 854; *United States v. Swenson*, 25 F.4th 309, 322 (5th Cir. 2022) (observing that "where a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme" (internal quotations omitted)).[3] The MVRA also permits restitution to be imposed on any defendant for the full amount of the victim's losses or apportioned based on each defendant's contribution. *See* 18 U.S.C. § 3664(h).

Conduct that generates illegal proceeds is conduct in furtherance of a conspiracy to commit money laundering. *See United States v. Shah*, 95 F.4th 328, 360 (5th Cir. 2024) ("Conspiracy to commit money laundering does not require that the defendant know exactly what unlawful activity generated the proceeds.... The defendant merely must know that the transaction

---

[3] *See also United States v. Ochoa*, 58 F.4th 556 (1st Cir.), *cert. denied,* 144 S. Ct. 178 (2023) ("[U]nder the MVRA, members of a conspiracy may be 'held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator.'") (quoting *United States v. Moeser*, 758 F.3d 793, 797 (7th Cir. 2014))); *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (holding that restitution under the MVRA extends to "the reasonably foreseeable actions of [a] defendant's co-conspirators," including "the common plan of the conspiracy" (internal quotation omitted)); *United States v. Riley*, 335 F.3d 919, 932 (9th Cir. 2003) ("A conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy." (citation omitted)).

involved profits of unlawful activity." (cleaned up)).[4] The jury convicted Hall of conspiracy to commit money laundering. The superseding indictment charged that the conspiracy's purpose was to "engage and attempt to engage . . . in monetary transactions in criminally derived property of a value greater than $10,000," with those funds stemming from "conspiring to defraud the United States by paying and receiving health care kickbacks . . . and paying and receiving illegal health care kickbacks . . . ." The indictment further alleged that Hall and his co-conspirators used the proceeds to "enrich themselves and others through the purchase of luxury vehicles and chartered vessels, among other property." Trial evidence confirmed that the kickback scheme's proceeds funded this spending. At sentencing, the district court expressly found that Hall's money laundering conspiracy conviction directly and proximately caused the government's loss. Because Hall's conduct was both part of and essential to the scheme, the district court properly based its restitution order on the government's total loss. We hold that the district court did not err in imposing restitution. *See King*, 93 F.4th at 854.

## IV.

For the foregoing reasons, we AFFIRM Hall's convictions and the district court's restitution order.

---

[4] *See also United States v. Woodmore*, 127 F.4th 193, 220 (10th Cir. 2025) ("[C]onviction for conspiracy to commit money laundering . . . does not require proof of an overt act in furtherance of the conspiracy . . . . Instead, all that is required is agreeing to obtain illegal proceeds and to launder those proceeds." (cleaned up)); *United States v. Abbas*, 100 F.4th 267 (1st Cir.), *cert. denied*, 145 S. Ct. 319 (2024) (concluding that the defendant's emails were "overt acts that furthered the [money laundering] conspiracy because the steps a conspirator takes to produce the proceeds subsequently laundered furthers a money-laundering conspiracy." (citing *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012))).